IN THE UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
GALVESTON DIVISION

| | | |
|---|---|---|
| TEXAS STANDARD OIL COMPANY | § | |
| | § | |
| VS. | § | CIVIL ACTION NO. G-05-490 |
| | § | |
| FOREST OIL CORPORATION, ET AL | § | |

**PLAINTIFF TEXAS STANDARD OIL COMPANY'S
MOTION FOR PARTIAL SUMMARY JUDGMENT**

COMES NOW Plaintiff, Texas Standard Oil Company ("TXSO"), and, for its Motion for

Partial Summary Judgment pursuant to Federal Rules of Civil Procedure, Rule 56, would show

as follows:

## I. SUMMARY OF ARGUMENT

TXSO is entitled to summary judgment on its claim for declaratory judgment against

Forest Oil Corporation ("FOC"), Mariner Energy, Inc. ("MEI"), and Mariner Energy Resources,

Inc. ("MERI") (referred to collectively as "FOC"), in that TXSO is entitled to its ownership share

of the proceeds of production from Well No. 12, West Delta Block 34.  FOC, acting as Operator,

refused to allow TXSO its share in the production from this well, and instead wrongfully

distributed TXSO's interest in that well to other working interest owners, on the false grounds

that TXSO forfeited its interest in the entirety of Block 34, including Well No. 12, when TXSO

refused to consent to another operation proposed on West Delta Block 34, regarding Well No. 8.

FOC's application of the forfeiture non-consent penalty under the applicable Offshore

Operating Agreement is wrong, first because the operation on which such forfeiture non-

consent penalty is based was improperly noticed under the applicable Offshore Operating

Agreement, and, therefore unauthorized.  Consequently, TXSO's failure to consent to that

operation cannot trigger the application of the forfeiture non-consent penalty.  Additionally, the operation on which the forfeiture non-consent penalty was unilaterally imposed by FOC was not required to maintain the lease on West Delta Block 34.  A separate operation, the drilling of Well No. 12, had already been authorized by all of the parties to the applicable Offshore Operating Agreement, either by consent and participation or under a Farmout Agreement.

Only the non-consent of an operation <u>required</u> to maintain the lease under the applicable Offshore Operating Agreement can result in the forfeiture non-consent penalty.  Drilling Well No. 12 under the Farmout Agreement would have (and did) maintain the lease of West Delta Block 34.  TXSO's failure to consent to the proposed operation on Well No. 8 thus cannot justify the Defendants' unilateral imposition of the forfeiture non-consent penalty on TXSO.

As a consequence either of FOC conducting an unauthorized operation, or of the operation performed not constituting a lease maintenance operation, TXSO seeks an order of this Court declaring that:

A.    TXSO is not a non-consenting party to the April AFE operation;

B.    the April AFE operation was not authorized under the WD34 OOA;

C.    TXSO retains all its right, title and interest in WD34 under the OOA;

D.    TXSO retains its rights under the Farmout Agreement.

2

## II.  **UNDISPUTED FACTS**

Forest Oil Corporation is the operator under an Offshore Operating Agreement made as of January 3, 1977 (the "OOA"), covering Block 34, West Delta Area, Offshore Louisiana ("WD34").[1]  TXSO is a non-operating working interest owner in, and party to the WD34 OOA.

Effective February 25, 2004, the parties to the WD34 OOA entered into a Farmout Agreement, the purpose of which was to allow Farmee, Houston Energy, L.P., the right to drill an exploratory well on WD34.[2]  On July 4, 2004, Farmors spud the farmout well, No. 12,[3] which was successful in establishing commercial production and is holding the lease on WD34 to the present.

After the Farmout Agreement had already been agreed to by the working interest owners *except* Apache (which participated in drilling Well No. 12), Well No. 8 went off-line on February 28, 2004, and production ceased on WD34.[4][5]  At that time, Well No. 8 was the last producing well on the block.  Accordingly, the parties had 180 days from the date production ceased on Well No. 8 to commence additional operations or the lease would terminate.[6]  Farmees were

---

[1]  *See* Exhibit 1 (Offshore Operating Agreement Block 34 N½ West Delta Area Offshore Louisiana between Transco Exploration Company, Operator, and Freeport Oil Company, Energy Development Corporation, Pioneer Production Corporation, The Continental Group, Inc., and McMoRan Exploration Co., made and entered into as of January 3, 1977) (hereinafter "OOA").

[2]  *See* Exhibit 2 (Farmout Agreement made and entered as of February 25, 2004).

[3]  *See* Exhibit 3 (PIO000641; "Daily Drilling Report," Well No. 12, dated July 6, 2004).

[4]  *See* Exhibit 4 (Anthony Tatarski deposition at 71:9–10).

[5]  *See* Exhibit 5 (FOC 1837; "Daily Well Detail," at p.2).

[6]  *See* Exhibit 6 (Scott Hess deposition at 75:17–25).  180 days from February 28, 2004, was August 26, 2004.

required to commence the drilling of the farmout well on or before August 1, 2004, which was within this 180 day period.[7]

On March 19, 2004, FOC sent its Authorization for Expenditure ("AFE") No. 042358 to all working interest owners, proposing an operation to restore production from the K-6 sand in Well No. 8 (the "March AFE"), and setting up a recompletion to two other zones, the K-3 and the 10,180' sands.[8]  FOC incorrectly characterized the March AFE a "lease saving operation."[9]  Nonetheless, TXSO executed the March AFE, consenting to these operations.[10]

On April 13, 2004, FOC sent a second AFE with the same number, proposing to restore production from the K-6 zone in Well No. 8, and setting up a recompletion to a different zone, the K-5 (the "April AFE"), without characterizing this proposal as a lease maintenance operation as required by the OOA.[11] [12]  Unlike the March AFE, FOC internally documented the April AFE, and identified the operations as carrying the standard non-consent penalty, as opposed to

---

[7]  *See* Exhibit 7 (Executed letter dated April 28, 2004, amending farmout spud date to August 1, 2004).

[8]  *See* Exhibit 8 (March 17, 2004, AFE No. 042358, signed by TXSO's President, Timothy M. Roberson).

[9]  *See* Exhibit 9 (Scott Hess email of March 19, 2004)

[10]  *See* Exhibit 8 (March 17, 2004, AFE No. 042358, signed by TXSO's President, Timothy M. Roberson).

[11]  *See* Exhibit 10 (Lisa Marie email of April 13, 2004).

[12]  *See* Exhibit 11 (April 13, 2004, AFE No. 042358).

identifying it as a lease maintenance operation carrying the forfeiture non-consent penalty.[13] [14] TXSO did <u>not</u> consent to these operations.[15]

FOC did not conduct the operations proposed in the March AFE,[16] but instead conducted the operations proposed in the April AFE.[17]  Because TXSO did not consent to the April AFE, FOC deemed TXSO nonconsent in a lease maintenance operation, and demanded that TXSO assign its interest in the entire lease, including Well No. 12, to all remaining working interest owners.[18]  Despite initially advising TXSO that its revenue payments would be suspended,[19] FOC later seized TXSO's share of production revenues from Well No. 12 without notice to TXSO and distributed those to itself and the other working interest owners.[20]

---

[13]  *See* Exhibit 6 (Scott Hess deposition, at 114:4–8).

[14]  *See* Exhibit 12 (FOC Request for Approval dated April 12, 2004 (identifying 400% non-consent penalty)).

[15]  *See* Exhibit 13 (Timothy M. Roberson letter of November 5, 2004, to Scott Hess).

[16]  *See* Exhibit 6 (Scott Hess deposition at 130:10–12).

[17]  *See* Exhibit 14 (Scott Hess letter of November 30, 2004).

[18]  *See id*.

[19]  *See id*.

[20]  *See* Exhibit 15 (Scott Hess letter of April 18, 2005).

### III.  SUMMARY JUDGMENT GROUNDS

A.    Summary Judgment Standard

"A party seeking to recover upon a claim . . . or to obtain a declaratory judgment may . . . move with or without supporting affidavits for a summary judgment upon all or any part thereof."[21]

Summary judgment shall be rendered in a lawsuit where the evidence shows that there is no genuine issue of any material fact and the moving party is entitled to a judgement as a matter of law.[22]  The moving party initially bears the burden of showing that no material facts exist for summary judgment to be granted.[23]  Once the movant has made its initial showing, the party opposing the motion must come forward with competent summary judgment evidence showing the existence of a genuine fact issue for trial.[24]  If the nonmoving party fails to show the existence of a triable issue of material fact and the moving party is entitled to judgment as a matter of law, then summary judgment should be granted.[25]

---

[21]  Fed. R. Civ. P. 56(a).

[22]  *See* Fed. R. Civ. P. 56(b)–(c); *Celotex Corporation v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 2552(1986).

[23]  *See id.*

[24]  *See* Fed. R. Civ. P. 56(e); *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586, 106 S.Ct. 1348, 1356 (1986) (noting that such evidence must be more than a "metaphysical doubt as to the material facts" and must be sufficient to show there is a genuine issue for trial).

[25]  *See Celotex*, 477 U.S. at 323, 106 S.Ct. at 2552.

"The interpretation of an unambiguous contract is a question of law for the court to decide."[26] "The primary concern a court has in construing a contract is to ascertain and give effect to the intent of the parties as expressed in the contract.  The objective intent of the parties controls, and absent an allegation of ambiguity in the contract's language, the contract alone will generally be deemed to express the intent of the parties."[27]  No party has alleged the OOA is ambiguous.

        B.     <u>TXSO is Entitled to Summary Judgment</u>

        1.     **The Relevant OOA Terms**

The WD34 OOA provides that "[w]ithout the consent of all parties in interest, no operation shall be conducted in The Property except as hereinafter provided for by this Agreement."[28]  The types of operations that may be proposed in the context of a previously producing well are set forth in the OOA.[29]  Each is listed in the singular, or in the disjunctive, but never in the plural, or conjunctive.[30]  If an authorized operation is proposed, the notice itself must comply with the OOA, and contain a specific description of the operation.  Most importantly, the notice must also state "whether the proposer <u>considers</u> it to be an operation to which the

---

[26] *New Bremen Corporation v. Columbia Gas Transmission Corporation, et al.*, 913 F.Supp. 985, 990 (Tex. 1995)

[27] *Norman v. Apache Corp.*, 19 F.3d 1017, 1024 (5th Cir. 1994).

[28] Exhibit 1 (OOA at p.5, ¶ 7.2)

[29] *See* Exhibit 1 (OOA at p.5, ¶ 8.1(d) (Any party, Operator, or Non-Operator, may at any time propose the following operations on The Property . . . : (d) recompleting, deepening, reworking <u>or</u> sidetracking a well which has ceased or failed to produce in paying quantities after a previous completion" (emphasis added).

[30] *See id*.

provisions of Paragraph 8.21 (Lease Maintenance Operation) of this Article would apply."[31]  If a party to the operating agreement fails to consent to an operation, there are two possible non-consent penalties that may be applied.

On one hand, if a party non-consents an operation that results in production, then the operation's participants "shall own all operating rights therein and all such production thereby obtained until such time as they shall have received currently out of the net proceeds of the sale of the share of such production . . . an amount equal to (a) 400% of the share of the total cost and expense incurred in such operation through the wellhead . . . which would have been paid by such non-participant if it had been a participant; and (b) 150% of the share of the total cost and expense incurred in such operation beyond the wellhead . . . which would have been paid by such non-participant if it had been a participant" (for purposes of this motion, the "standard" non-consent penalty).[32]

On the other hand, "a party electing not to participate in a lease maintenance operation will assign to the participating parties in the proportion to which they participate therein, all of its right, title and interest in such lease, or the affected portion thereof . . . ."[33]  The OOA defines a "lease maintenance operation . . . as one required to maintain the Property or a portion thereof, at its expiration date or otherwise" (for purposes of this motion, the "forfeiture" non-consent penalty).[34]

---

[31]  *See id.* (OOA at p.6, ¶ 8.2)

[32]  *See* Exhibit 1 (OOA at pp. 9–10, ¶ 8.12).

[33]  *See* Exhibit 1 (OOA at p.12, ¶ 8.21).

[34]  *See* Exhibit 1 (OOA at p.12, ¶ 8.21).

2.    **The April AFE Proposed an Unauthorized Operation, Which Cannot
Support the Imposition of a Non-Consent Penalty**

Contrary to the single operation language of the OOA, Forest's April AFE proposed two operations: 1) pull the tubing and run a new string to the K-6 sand; and, 2) set up the well with one selective in the K-5 sand.[35]  The first operation is a "reworking" operation under the OOA, as it proposed to replace the parted tubing down to a previously completed zone.[36]  The second operation part of a "recompleting" operation under the OOA.[37]  Only the first operation had the potential for restoring production to Well No. 8.  The second operation had no impact on restoring production, and was only done in anticipation of attempting future production from the selected zones.[38]

By combining parts of a second operation with the first operation, Forest's proposal did not conform to the strict requirements of the OOA for proposing only single operations. Allowing a proposal that combines two operations in a single proposal forces TXSO either to consent to, and to pay for, part of an operation it did not want to perform (in this instance, the second, plugback, operation), or non-consent the entire proposal and suffer the non-consent penalty on the desired first operation it did want to perform (in this instance, the first, rework, operation).  The OOA simply does not allow FOC to require one non-consent election on a

---

[35]  *See* Exhibit 11 (April 13, 2004, AFE No. 042358).

[36]  *See* Declaration of Charles A. Sharman in Support of Texas Standard Oil Company's Motion for Partial Summary Judgment at p.1, ¶ 5.

[37]  *See id*. at p.2, ¶ 6 (more specifically, a recompletion operation may also be called a "plugback" (working higher up the hole from a previous completion). The proposed recompletion zone (the K-5) is above the existing K-6 completion, making the second operation proposed in the April AFE a "plugback."

[38]  *See id*. at p.2, ¶ 8

9

proposal to conduct multiple operations.  The OOA only contemplates single operations, and thus only allows single elections.   TXSO had the right to elect whether to consent to each operation separately. Therefore, TXSO's failure to consent to the April AFE cannot support the application of any non-consent penalty, as the proposal contains multiple operations, which are not authorized under the OOA.

It is well established that a defective notice of an operation under an operating agreement does not trigger a non-consent penalty.[39]  A complete failure to notice an operation likewise does not trigger the application of a non-consent penalty.[40]  In this case, the April AFE notice failed because 1) it set out multiple operations, which is not allowed under the single operation language set out in the OOA, and 2) the documents transmitted with the April AFE did not identify the operation as a "Lease Maintenance Operation," as required by the OOA at its section 8.2.[41]

When FOC transmitted its March AFE on March 19, 2004, it identified the operation as a "lease saving operation."[42]  When FOC transmitted its April AFE on April 12, 2004, it did not specifically refer to the April AFE as a "lease saving operation," because 1) it knew that the

---

[39]  *See Dorsett v. Valence Operating Co.*, 111 S.W.3d 244 (Tex. App.–Texarkana 2003), rehr'g overruled, review granted (May 14, 2004), rev'd on other grounds, 48 Tex. Sup.Ct.J. (May 20, 2005).  *See also*, *El Paso Production Co. v. Valence Operating Co.*, 112 S.W.3d 616, 623 (Tex.App.–Houston [1st Dist.], 2003), rehr'g overruled, review denied (operator failed to give working interest owner required notice; held "failure to consent to the rework operation cannot result in the imposition of any of the contractual penalties because the obligation to give timely notice of consent triggered *only* by the required notice of the proposed operation" (emphasis in the original)).

[40]  *See ExxonMobil Corporation v. Valence Operating Co.*, 174 S.W.3d 303, 317 (Tex.App.–Houston [1st Dist.], 2005) (citing *El PasoProduction Co. v. Valence Operating Co.*)

[41]  *See* Exhibit 12 (FOC Request for Approval dated April 12, 2004 (identifying 400% non-consent penalty)).

[42]  *See* Exhibit 9 (Scott Hess email of March 19, 2004).

March and April AFEs proposed different operations,[43] and 2) it internally documented the April

AFE as carrying only the standard non-consent penalty.  Only after FOC ran into great difficulty

and cost overruns on the Well No. 8 operations, and after the farmout Well No. 12 was

successfully drilled, and produced, did FOC attempt to claim the forfeiture non-consent penalty

against TXSO.

FOC has proceeded from the position that it, as operator, is the sole arbiter of what

constitutes a lease maintenance operation.[44]  However, the OOA does not give the operator this

power.  Under the OOA, any party may propose an operation.  In the notice to be given, the

proposing party is required to state whether it considers its operation to be a lease maintenance

operation.[45]  There is no provision in the OOA that gives any party, operator or non-operator, the

right to propose an operation, not state whether it considers it to be a lease maintenance

operation, and then after an operation has been completed, declare it to be a lease maintenance

operation and trigger any non-consent penalty, let alone a forfeiture non-consent penalty.

Because a defective notice cannot trigger any non-consent penalty, TXSO is not required

to forfeit its interest in West Delta 34 Block.  In this instance, TXSO agreed to the March AFE,

which was identified by FOC as a "lease saving operation."  Forfeiture of TXSO's interest is the

---

[43] *See* Exhibit 12 (FOC Request for Approval dated April 12, 2004 (identifying 400% non-consent penalty)).

[44] *See* Exhibit 14 (Scott Hess letter of November 30, 2004 ("[W]e advised [TXSO] . . . the work on the No. 8 ST Well constituted a lease maintenance operation under Section 8.21 of the" OOA . . . " (emphasis added))).

[45] *See* Exhibit 1 (OOA at p.6, ¶ 8.2)

11

most extreme penalty contemplated under the OOA.  As such, it can only be triggered by strict

adherence to the OOA.[46]

3.      **TXSO's execution of the Farmout Agreement was sufficient to maintain its interest in WD34**

The Farmout Agreement is treated as a proposal to perform an operation under the OOA.

Indeed, most parties to the OOA, including the farmees and TXSO, ratified and amended the

OOA.[47]  Apache treated it like a proposal, and consented to drill the well as a participant, and <u>not</u>

to farm out their interests.[48]  With the proposal to drill Well No. 12 in place, any later proposals

would <u>not</u> be <u>required</u> to maintain the lease.  Furthermore, after the farmout well was agreed to

by all the working interest owners, later proposals for other operations cannot be <u>required</u>

operations to preserve the lease until the farmout agreement expires on its own terms.  This did

not happen.  Quite the opposite, farmout Well No. 12 was successfully spud on July 4, 2004, and

production from Well No. 12 is now holding the WD34 lease.

"[T]he lessee's rights under a typical oil and gas lease terminate automatically and

completely at the end of the primary term unless the lessee or an assignee is conducting drilling

operations. Automatic termination wipes out in an instant all of the money that the lessee may

have spent acquiring and evaluating the prospect, and ends the lessee's prospects of developing

the resources covered by the lease. Though far more oil and gas leases terminate at the end of

---

[46] *Compare, Stable Energy, L.P. v. Kachina Oil & Gas, Inc.*, 52 S.W.3d 327, 333 (Tex.App.–Austin, 2001) (no writ).

[47] *See* Exhibit 16 (NOB0351; Ratification and Amendment of Operating Agreement, executed effective as of February 25, 2004).

[48] *See* Exhibit 17 (APA0251; Apache Corporation's election to participate in the operation to drill Well No. 12).

their primary terms than are drilled, <u>lease termination is an anathema to oil companies</u>. Drilling is considered the natural order of things both by potential farmors and potential farmees. A primary motivation of farmors in entering into farmout agreements, therefore, is to prevent lease termination."[49]   "The primary characteristic of the farmout is the [farmee's] <u>obligation</u> to drill one or more wells on the assigned land as a prerequisite to completion of the transfer."[50]

Despite FOC's later protestations <u>during</u> this litigation that there was no certainty the farmout well would be drilled, contemporaneously with the events giving rise to this litigation, FOC never questioned whether it would be drilled, and treated it as a certainty.[51]  FOC's James "Bud" Knell, after all his years in the industry, could not recall <u>one instance</u> in which a party offering to drill a farmout for FOC had failed to do so.[52]  The Farmout Agreement itself recites that "Farmee . . . <u>shall commence</u> or cause to be commenced the drilling of a well . . . ."  If FOC had done <u>nothing</u>, then the lease would have been held by the drilling of the farmout well No. 12.

4.     **The operation proposed in the April AFE was not required to maintain the WD34 lease**

Because the Farmout Agreement had been agreed to by all parties prior to FOC sending out its April AFE, the operation proposed by FOC in the April AFE was not <u>required</u> to maintain WD34.   Rather, there was pending at the time of the April AFE, a proposal in the form of the

---

[49]  Lowe, *Analyzing Oil and Gas Farmout Agreements*, 41 SOUTHWESTERN LAW JOURNAL No. 3 (September 1987).

[50]  *ExxonMobil Corp. v. Valence Operating Co.*, 174 S.W.3d at 313.

[51]  *See* Exhibit 18 (Scott Hess email of January 28, 2004 ("Houston Energy <u>will</u> drill [a well] on or before <u>May 1, 2004</u>) (some emphasis added).

[52]  *See* Exhibit 19 (James "Bud" Knell deposition at 47:3–19).

Farmout Agreement, which, when performed, would save the lease. Since there were two proposals pending, either of which would maintain the lease, neither is <u>required</u>. Consequently, TXSO's decision not to consent to the April AFE cannot invoke the non-consent penalty, as it had already consented to another lease saving proposal in the form of the Farmout Agreement, which would (and did) also preserve the lease.

## IV.  CONCLUSION

For the reasons stated, and as a consequence either of FOC conducting an unauthorized operation, or of the operation performed not constituting a lease maintenance operation, TXSO seeks an order of this Court declaring that:

A.      TXSO is not a non-consenting party to the April AFE operation;

B.      the April AFE operation was not authorized under the WD34 OOA;

C.      TXSO retains all its right, title and interest in WD34 under the OOA;

D.      TXSO retains its rights under the Farmout Agreement;

and for all such other and further relief to which TXSO may show itself justly entitled.

Respectfully submitted,

*/s/ Francis I. Spagnoletti*

_____
Francis I. Spagnoletti
State Bar No. 18869600
401 Louisiana Street, 8th Floor
Houston, Texas 77002
Telephone:      713-653-5600
Facsimile:      713-653-5656

14

**OF COUNSEL:**

SPAGNOLETTI & CO.
David S. Toy
State Bar No. 24048029

**ATTORNEYS FOR PLAINTIFF**

<u>CERTIFICATE OF SERVICE</u>

I HEREBY CERTIFY that service of the foregoing was on this date automatically accomplished on all known Filing Users through the Notice of Electronic Filing. Service on any party or counsel who is not a Filing User was accomplished via Email, Facsimile, Certified Mail/RRR or U.S. First Class Mail, in accordance with the Federal Rules of Civil Procedure on this 20th day of July, 2007.

*/s/ David S. Toy*

_____

David S. Toy

15