IN THE UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
GALVESTON DIVISION

| | | |
|---|---|---|
| TEXAS STANDARD OIL COMPANY, | § | |
| | § | |
| Plaintiff, | § | |
| | § | CIVIL ACTION NO. G-05-490 |
| vs | § | JURY DEMAND |
| | § | |
| FOREST OIL CORPORATION, | § | |
| | § | |
| Defendant. | § | |

**FOREST OIL CORPORATION, MARINER ENERGY RESOURCES, INC.
AND MARINER ENERGY, INC.'S RULE 56 MOTION FOR SUMMARY JUDGMENT**

TO THE HONORABLE UNITED STATES DISTRICT COURT JUDGE:

Defendant/Counter-Plaintiff Forest Oil Corporation ("FOC"), Defendant/Counter-Plaintiff

Mariner Energy Resources, Inc. ("MERI") and Defendant Mariner Energy, Inc. ("MEI")

(collectively "Movants") file their Motion for Summary Judgment, pursuant to Rule 56, Fed. R.

Civ. P., and in support thereof would show as follows:

**I.      Introduction**

1.      On or about September 7, 2005, Texas Standard Oil Company ("TXSO") brought

suit against FOC.  In its suit, TXSO asserted claims for breach of contract, declaratory relief and

for an accounting under two Offshore Operating Agreements between the parties.

2.      On or about January 13, 2006, FOC filed a Counter-Claim against TXSO asserting

claims for breach of contract, unjust enrichment and declaratory relief.

3.      As a result of MERI's purchase of FOC's interest in the properties made the basis of this dispute, on or about May 3, 2006, TXSO amended its Complaint and joined MERI and MEI as Defendants.

4.      On or about October 23, 2006, MERI filed a Counter-Claim against TXSO seeking relief virtually identical to FOC. MERI recently amended its Counter-Claim asserting a claim for breach of a Gas Balancing Agreement.

5.      On or about September 1, 2006, MERI filed a Motion to Dismiss for Failure to Join Indispensable Parties, namely Apache Corporation ("Apache"), Pioneer Natural Resources USA, Inc. ("Pioneer"), and Noble Energy, Inc. ("Noble"). In its response, TXSO conceded that Apache, Pioneer and Noble were indispensable parties and agreed to voluntarily join them as Defendants in the case, as well as Coldren Resources, L.P. ("Coldren"), which bought Noble's interest in the properties at issue. Each of these working interest owners is now a party to this lawsuit.

6.      FOC and MERI now seek summary judgment on all claims they have asserted against TXSO in that they are entitled to judgment as a matter of law on undisputed facts. FOC, MERI and MEI also seek summary judgment on the basis that TXSO cannot make a showing sufficient to establish the existence of an element essential to its case on which it bears the burden of proof at trial.

## II.     Brief Factual Background

7.      The parties' dispute arises out of the Offshore Operating Agreements covering properties located offshore Louisiana and Texas. The property offshore Louisiana is known as

2

the West Delta 34 property (the "WD 34 Property"). The property offshore Texas is known as the High Island 552 property (the "HI 552 Property"). There is a separate Operating Agreement for each property, but the terms of the agreements are virtually identical.[1] True and correct copies of the Operating Agreement for each property are attached to the Hess Affidavit as Exhibit "1" (the "WD 34 Operating Agreement") and Exhibit "2" (the "HI 552 Operating Agreement").

8.      At various relevant times, FOC, MERI, Apache, Pioneer, Noble/Coldren, and TXSO are or were parties to the Operating Agreement covering the WD 34 Property. FOC, MERI, Noble/Coldren and TXSO are or were parties to the Operating Agreement covering the HI 552 Property. FOC was the operator of both of the properties until MERI became the operator following FOC's assignment of its interest to MERI.

9.      At the core of this dispute are the Operating Agreements, and the attachments to those agreements. More specifically, the instant dispute concerns the rights and obligations of the parties under the WD 34 Operating Agreement due to the cessation of production on the No. 8 Well located on the WD 34 Property. The dispute also concerns the permanent cessation of production on the HI 552 Property and the parties' obligations under the Gas Balancing Agreement which is Exhibit "C" to the HI 552 Operating Agreement. Lastly, the dispute concerns the non-payment by TXSO of operating expenses due per the terms of the WD 34 and HI 552 Operating Agreements.

---

[1] The WD 34 Property is adjacent to the State of Louisiana and the HI 552 Property is adjacent to the State of Texas. Pursuant to the Outer Continental Shelf Lands Act ("OSCLA") 43 U.S.C. §§1333(a)(2)(A) and case law interpreting same, Louisiana law applies to the WD 34 Operating Agreement and Texas law to the HI 552 Operating Agreement. *See*, *Union Texas Petroleum Corp. v. PLT Engineering, Inc.*, 895 F.2d 1043, 1047 (5th Cir. 1990); *Wooten v. Pumpkin Air, Inc.*, 869 F.2d 848, 852 (5th Cir. 1989). The adjacent state's law applies even if there is a provision in the Operating Agreement designating another states's law. *Union Texas Petroleum Corp.*, 895 F.2d at 1050.

10.    The facts necessary to render a summary judgment as to FOC and MERI's claims are not in dispute, and TXSO can assert no facts to defeat FOC, MERI and MEI's motion for summary judgment.  Further, the Operating Agreements from which the claims arise are not ambiguous, nor has any party claimed ambiguity.  FOC, MERI and MEI are entitled to summary judgment as a matter of law as set forth herein.

## III.    Standard for Summary Judgment

11.    Summary judgment is proper if the evidence shows that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law.  *Kee v. City of Rowlett*, 247 F.3d 206, 210 (5th Cir. 2001).  The moving party has the initial burden of establishing that there are no issues of material fact and that it is entitled to judgment in its favor as a matter of law.  *See Rivera v. Houston Indep. Sch. Dist.*, 349 F.3d 244, 246-47 (5th Cir. 2003).  Once the moving party establishes that there is no genuine issue, the burden shifts to the nonmoving party to produce evidence of the existence of a genuine issue for trial.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).  The nonmoving party cannot rely only upon allegations, denials in a pleading, or unsubstantiated assertions that a fact issue exists, but must "set forth specific facts showing the existence of a 'genuine' issue concerning every essential component of its case."  *Morris v. Covan World Wide Moving, Inc.*, 144 F.3d 377, 380 (5th Cir. 1998).  The evidence presented by the nonmoving party must be significant and probative to prevent summary judgment.  *Union Planters Nat'l. Leasing Inc. v. Woods*, 687 F.2d 117 (5th Cir. 1982).

12.    Interpretation of an unambiguous contract is a matter of law to be decided by the court.  *Holt Oil & Gas Corp. v. Harvey*, 801 F.2d 773, 780 (5th Cir. 1986) (*citing Southern*

4

*Natural Gas Co. v. Pursue Energy*, 781 F.2d 1079, 1081 (5th Cir. 1986)). *See also Mobil Exploration & Producing U.S., Inc. v. Certain Underwriters Subscribing to Cover Note 95-3317(A)*, 837 So.2d 11, 23-24 (La. Ct. App. 2002) ("Contracts have the effect of law for the parties....When a contract can be interpreted from the four corners of the instrument, the question of contractual interpretation is answered as a matter of law, and summary judgment is appropriate."); *Coker v. Coker*, 650 S.W.2d 391, 393 (Tex. 1983) (stating that a court may construe a contract as a matter of law if it is unambiguous and can be given a certain or definite legal meaning or interpretation.)

## IV.   Summary Judgment Evidence

13.   FOC, MERI and MEI's Motion for Summary Judgment is supported by the following summary judgment evidence which is attached hereto and incorporated herein by reference:

- Exhibit "A" – Affidavit of Scott Hess with exhibits ("Hess Affidavit");
- Exhibit "B" – Business Records Affidavit of Anne Rogge with exhibits ("Rogge Affidavit");
- Exhibit "C" – Affidavit of Ron Smith (attesting to various matters and authenticating business records) with exhibits ("Smith Affidavit");
- Exhibit "D" – Affidavit of Phillip Innes with exhibits ("Innes Affidavit");
- Exhibit "E" – Affidavit of Bradley L. DeLuca with exhibits ("DeLuca Affidavit");
- Exhibit "F" – TXSO's Responses to FOC's Request for Admissions; and,
- Exhibit "G" – TXSO's Answer to FOC's Interrogatories.

A complete index of the exhibits to this Motion for Summary Judgment is attached hereto as Exhibit "1."

**V.    Undisputed Facts**

14.    The following undisputed facts support this Motion:

- The No. 8 Well on the WD 34 Property ceased production on or about February 28, 2004. *See Hess Affidavit.*

- At that time, FOC owned a 38.31% working interest in the WD 34 Property, TXSO owned a 30% working interest, Apache owned an 8.34% working interest, Noble owned an 8.34% working interest and Pioneer owned a 15% working interest. *See Exhibit 1 to Hess Affidavit.*

- At the time the No. 8 Well ceased production, it was the sole producing well on the WD 34 Property. *See Hess Affidavit.*

- Under the terms of the WD 34 lease, the lease would expire one hundred eighty (180) days after the cessation of production, or August 28, 2004. *See Hess Affidavit.*

- FOC sought to determine the cause of the cessation of production, the prudent manner in which to re-establish production and the approximate costs associated therewith. *See Hess Affidavit.*

- On or about March 19, 2004, FOC forwarded to TXSO, Apache, Pioneer, and Noble AFE No. 042358 (the "March AFE"). The e-mail and the attached AFE notified the working interest owners that the No. 8 Well had ceased production, that the tubing on the well needed to be replaced, that the well would be set up for future re-completion in two selective sands and that, per the terms of the Operating Agreement, the owners had thirty (30) days in which to elect to participate in the lease maintenance operation. *See Exhibit 3 to Hess Affidavit.*

- On or about March 30, 2004, Apache executed and returned the March AFE. *See Exhibit 4 to Hess Affidavit.*

- On or about April 12, 2004, FOC advised the working interest owners that the proposed future re-completion plan for the No. 8 Well, but not the work-over plan, had changed in scope and that FOC recommended, in addition to replacing the tubing, future re-completion in a different sand. The e-mail also notified the owners that the re-completion plan set forth in the March AFE would not go forward. *See Exhibit 5 to Hess Affidavit.*

- On or about April 13, 2004, FOC sent AFE No. 042358 (the "April AFE") to the working interest owners which included the new re-completion plan. *See Exhibit 6 to Hess Affidavit.*

6

- Only Apache, with an 8.34% working interest, executed the March AFE before it was withdrawn. *See Hess Affidavit.*

- Apache, Pioneer, and Noble executed and returned the April AFE. *See Exhibits 7, 8, and 9 to Hess Affidavit.*

- TXSO, on the other hand, executed and returned the March AFE. *See Exhibit 10 to Hess Affidavit.*

- FOC notified TXSO that it had executed the wrong AFE and requested that TXSO execute the April AFE. TXSO never responded to FOC's e-mail or executed the April AFE. *See TXSO's Response to Request for Admission No. 5. See also Exhibit 11 to Hess Affidavit.*

- On or about April 23, 2004, the re-completion plan as set forth in the April AFE went forward. *See Hess Affidavit.*

- On or about October 18, 2004, FOC sent the working interest owners AFE No. 0424358 (the "October AFE") to further re-complete the No. 8 Well. *See Exhibit 12 to Hess Affidavit.*

- Apache, Pioneer and Noble executed the October AFE. However, by letter dated November 5, 2004, TXSO informed FOC that, "with respect to your pending AFE, Texas Standard, as a non-consenting party should not have been included on this AFE. We remain in a non-consent status in this well at this time." *See Exhibit 13 to Hess Affidavit.*

- A Farmout Agreement was entered into by all working interest owners with Helis Oil & Gas Co., L.L.C. effective February 25, 2004. *See Exhibit 14 to Hess Affidavit.* The Farmout Agreement was not fully executed until April 19, 2004. *Id.*

- Paragraph 2.1 of the Farmout Agreement provides that the failure to commence drilling shall cause the agreement to terminate in its entirety.

- A Farmout Agreement is not a lease maintenance operation. *See TXSO's answer to Interrogatory No. 23 in Exhibit "G".*

- The No. 12 Well, drilled pursuant to the Farmout Agreement, began producing in August 2004. *See Hess Affidavit.*

- Section 8.21 of the WD 34 Operating Agreement provides that a party electing not to participate in a lease maintenance operation will assign to the participating parties in the proportions in which they participate therein, all of its right, title and interest in such lease, or the affected portion thereof, free and clear of any burdens thereon as provided in Paragraph 8.16, retaining, however, its interest in and production from

7

previously completed wells which are producing, shut-in, or temporarily abandoned. *See Exhibits 1 to Hess Affidavit.*

- As a result of TXSO's failure to consent to a designated lease maintenance operation, the interest that TXSO would have had in the No. 12 Well was apportioned among the other working interest owners. *See Hess Affidavit.*

- TXSO refused to assign its interest in the WD 34 Property to the other working interest owners, despite Section 8.21 of the WD 34 Operating Agreement. *See Hess Affidavit. See TXSO's Response to Request for Admission No. 9 in Exhibit "F".*

## VI.   Claims on Which Movants are Entitled to Summary Judgment

15.   For ease of reference of the Court, Movants summarize their grounds for summary judgment as follows:

### A.   Breach of Contract/Specific Performance

FOC and MERI are entitled to judgment that TXSO breached the WD 34 Operating Agreement by failing to assign its interest in the WD 34 Property to the other working interest owners, other than its interest in and production from previously completed wells which are producing, shut-in, or temporarily abandoned.

### B.   Declaratory Relief

FOC and MERI are entitled to a declaratory judgment that:

- The re-completion plan on the No. 8 Well was the lease maintenance operation for the WD 34 Property under the terms of the WD 34 Operating Agreement;

- No aspect of the Farmout Agreement constituted a lease maintenance operation for the WD 34 Property under the terms of the WD 34 Operating Agreement;

- The April AFE was sent in conformance with the requirements of the WD 34 Operating Agreement and the work was authorized by the other working interest owners and performed in accordance with the terms of the WD 34 Operating Agreement;

8

- TXSO has no right, title or interest in the WD 34 Property (other than TXSO's interest in and production from wells completed prior to April 1, 2004 which are producing, shut-in or temporarily abandoned); and,

- TXSO must execute assignments of its right, title and interest in the WD 34 Property to the other working interest owners (other than TXSO's interest in and production from wells completed prior to April 1, 2004 that are producing, shut-in or temporarily abandoned).

**C.     Alternative Claim for Declaratory Relief**

Alternatively, should the Court determine that TXSO somehow retained its interest in the No. 8 Well or the No. 12 Well, FOC and MERI are entitled to a declaratory judgment that TXSO must pay its proportionate share of the costs and expenses on the No. 8 and No. 12 Wells as required by the WD 34 Operating Agreement.

**D.     Breach of Contract for Operating Expenses**

FOC and MERI are entitled to a judgment that TXSO breached both the WD 34 and HI 552 Operating Agreements by failing to pay its proportionate share of the operating expenses.

**E.     Breach of the Gas Balancing Agreement**

MERI is entitled to judgment that TXSO breached the Gas Balancing Agreement made a part of the HI 552 Operating Agreement by taking and receiving greater quantities of produced gas than they were entitled and refusing to settle the imbalance as required by the Gas Balancing Agreement and to a cash payment as damages for the remaining imbalance.

**F.     Unjust Enrichment**

FOC is entitled to a judgment that it recover from TXSO sums TXSO was unjustly enriched as a result of erroneous payments of revenue to TXSO on the No. 8 Well and the No. 12 Well on the WD 34 Property.

**G.     No Evidence of Gross Negligence**

FOC, MERI and MEI are entitled to a finding that the exculpatory clause contained in each of the Operating Agreements requires TXSO to establish that FOC, MERI and MEI were grossly negligent to prevail on all of its causes of action. FOC, MERI and MEI are also entitled to a judgment that there is no evidence of gross negligence on their part.

9

**H.**   **TXSO's Accounting Claim Time Barred**

FOC, MERI and MEI are entitled to a judgment in accordance with the accounting provisions of the Operating Agreements that the joint interest bills applicable to TXSO's working interests in the WD 34 Property and HI 552 Property are conclusively presumed to be true and correct for the years 2001 through 2004 and the request for an accounting is time barred.

**I.**   **Attorneys' Fees, Costs and Compound Interest**

FOC, MERI and MEI are entitled to recover their reasonable and necessary attorneys' fees, costs and compound interest.

## VII.   Arguments and Authorities

### A.   FOC and MERI's Claims for Breach of Contract and Specific Performance

16.   FOC and MERI are entitled to summary judgment for specific performance as a matter of law under the undisputed facts.   FOC, as operator, had responsibility for the management, operation, exploration and development of the WD 34 Property for the benefit of all working interest owners. *See Exhibit 1 to Hess Affidavit.* In discharge of these duties, upon the cessation of production on the No. 8 Well (the only producing well on the WD 34 Property at that time), FOC followed the terms of the WD 34 Operating Agreement and undertook steps to save the lease from expiring. *See Hess Affidavit.* Specifically, FOC sought to determine the cause of the cessation of production, the prudent manner in which to re-establish production and the approximate costs associated therewith, all of which were done knowing that the operation was necessary to save the lease from expiring. *Id.*

17.     FOC determined that it was necessary to replace the tubing in the No. 8 Well and recommended set up for future re-completion in two selective sands. Accordingly, FOC sent out an e-mail and the March AFE on March 19, 2004, indicating the work necessary to attempt to re-gain production in the No. 8 Well and further notifying the parties that the proposal was a lease maintenance operation. *See Exhibit 3 to Hess Affidavit.*

18.     On April 12 and 13, 2004, FOC withdrew the March AFE and replaced it with the April AFE.[2] *See Exhibit 4 to Hess Affidavit.* The only change recommended by FOC in the April AFE was to set up the future re-completion in a single, different sand. *See Hess Affidavit.* Otherwise, the proposal did not change. *Id.*

19.     At the time the March AFE was withdrawn, only Apache, with an 8.34% working interest, had executed the March AFE. Thus, the AFE was withdrawn prior to acceptance by a majority in interest (*i.e.*, greater than 50%) as required by the WD 34 Operating Agreement. *See Exhibit 1 to Hess Affidavit.* Significantly, TXSO did not execute the March AFE until April 16, 2004, four days after it was withdrawn by FOC. *See Exhibit 10 to Hess Affidavit.*

20.     Following withdrawal of the March AFE and the working interest owners' receipt of the April AFE, Noble, Pioneer and Apache each executed and consented to the April AFE. *See Exhibit 7, 8 and 9 to Hess Affidavit.* TXSO did **not** consent to the April AFE, which was a designated lease maintenance operation under the WD 34 Operating Agreement. *See Hess*

---

[2] The WD 34 Operating Agreement does not prohibit the withdrawal of an AFE despite TXSO's position to the contrary. TXSO's position that FOC could not withdraw the AFE leads to absurd consequences—if the operator cannot withdraw an AFE for an operation that needs to be modified in the face of a lease expiration, as here, then lessees would be prevented from modifying lease maintenance operations and would thus lose their interests or be forced to conduct detrimental operations. Each of the other working interest owners, including Apache, acknowledged the right of FOC to withdraw the March AFE

*Affidavit.* In fact, TXSO subsequently sent FOC a letter declaring "we remain in a non-consent status in this well at this time." *See Exhibit 12 to Hess Affidavit.* Since the majority in interest consented to the lease maintenance operation contained in the April AFE, the work outlined in the proposal began on or about April 23, 2004, well within the one hundred eight (180) day time period under the WD 34 lease.[3]

21.    FOC followed the requirements of the WD 34 Operating Agreement and the agreement is not ambiguous. Interpretation of an unambiguous contract is a matter of law for the court and courts are bound to enforce the contract as written. *Holt Oil & Gas Corp.,* 801 F.2d at 78, *citing, Cooper v. Olinde,* 565 So. 2d 978, 983 (La. App. 1st Cir.), writ denied, 569 So.2d 966 (La. 1990). As such, the Court must enforce paragraph 8.21 of the WD 34 Operating Agreement which provides, in pertinent part, that:

> A lease maintenance operation is defined for the purposes of this paragraph as one required to maintain the Property or a portion thereof, at its expiration date or otherwise. ***A party electing not to participate in a lease maintenance operation will assign to the participating parties in the proportions in which they participate therein, all of its right, title and interest in such lease, or the affected portion thereof, free and clear of any burdens thereon as provided in Paragraph 8.16,*** retaining, however, its interest in and production from previously completed wells which are producing, shut-in, or temporarily abandoned.

*See Exhibit 1 to Hess Affidavit.* (Emphasis added)

22.    The re-completion of the No. 8 Well was a lease maintenance operation under Paragraph 8.21, and TXSO elected not to participate in it. Therefore, FOC and MERI are entitled to a summary judgment that TXSO breached Paragraph 8.34 of the WD 34 Operating

---

[3] Under the WD 34 lease, the lease would expire if there was no production for 180 days.

Agreement. FOC and MERI are entitled to specific performance that TXSO assign its interest in

such lease, retaining, however, its interest in and production from previously completed wells

which are producing, shut-in, or temporarily abandoned, as the remedy of specific performance

is the preferred remedy for breach of contract. *J. Weingarten, Inc. v. Northgate Mall, Inc.*, 404

So.2d 896, 899-901(La. 1981).

### B.    FOC and MERI's Claims for Declaratory Relief

23.    FOC and MERI also seek a summary judgment pursuant to the Federal

Declaratory Judgment Act, 28 U.S.C. §2201, *et seq.* Based upon the undisputed facts, FOC and

MERI are entitled to the following declarations:

(a)    The re-completion plan for the No. 8 Well was the lease maintenance operation for the WD 34 Property under the terms of the WD 34 Operating Agreement;

(b)    No aspect of the Farmout Agreement constituted a lease maintenance operation for the WD 34 Property under the terms of the WD 34 Operating Agreement;

(c)    The April AFE was sent in conformance with the requirements of the WD 34 Operating Agreement and the work was authorized by the other working interest owners and performed in accordance with the terms of the WD 34 Operating Agreement;

(d)    TXSO has no right, title or interest in the WD 34 Property (other than TXSO's interest in and production from wells completed prior to April 1, 2004 which are producing, shut-in or temporarily abandoned); and,

(e)    TXSO must execute an assignment of its right, title and interest in the WD 34 Property (other than TXSO's interest in and production from wells completed prior to April 1, 2004 that are producing, shut-in or temporarily abandoned) to the other working interest owners.

**C.   FOC and MERI's Alternative Claim for Declaratory Judgment for Payment of TXSO's Proportionate Share of Costs and Expenses on the No. 8 Well and the No. 12 Well**

24.   In the alternative, should the Court determine that TXSO has retained its interest in the No. 8 and No. 12 Wells (a finding which is not supported by the uncontroverted evidence), FOC and MERI are nevertheless entitled to a declaration that TXSO pay its proportionate share of the costs and expenses incurred on those wells.

25.   Under the WD 34 Operating Agreement, each working interest owner must pay its proportionate share of all costs and expenses resulting from the operation of the properties. *See Exhibit 1 to Hess Agreement, Exhibit "A," Paragraph 3.* This payment obligation is more fully set forth in Paragraph 3 of Exhibit "A" to the WD 34 Operating Agreement, entitled "Accounting Procedure Joint Operations." Paragraph 3 provides, in pertinent part, that:

> Each Non-Operator shall pay its proportion of all bills within fifteen (15) days after receipt. If payment is not made within such time, the unpaid balance shall bear interest monthly at the rate of twelve percent (12%) per annum or the maximum contract rate permitted by the applicable usury laws...plus attorney's fees, court costs, and other costs in connection with the collection of unpaid amounts.

26.   If TXSO has an interest in these wells, it must pay the bills associated therewith.[4] Accordingly, if it is determined that TXSO has such an interest, under the Federal Declaratory Judgment Act, 28 U.S.C. §2201 *et seq.,* FOC and MERI seek a declaration from the Court that TXSO must pay $1,037,791.00 as its proportionate share of the costs and expenses incurred on the No. 8 Well (from April, 2004 to the present) and on the No. 12 Well. *See Innes Affidavit.*

---

[4] Note that regardless of whether TXSO must pay its share of the costs and expenses incurred on the No. 8 and No. 12 Wells post April 1, 2004, TXSO must nevertheless pay its proportionate share of all other operating expenses to maintain the WD 34 and HI 552 leases that do not relate to those specific wells. *See Section D.*

**D.    FOC and MERI's Claim for Breach of Contract for Failure to Pay Operating Expenses**

27.    Each of the working interest owners must pay its proportionate share of operating expenses resulting from the operation of the properties at issue as set forth in Paragraph 3 to the Operating Agreements which provides:

> Each Non-Operator shall pay its proportion of all bills within fifteen (15) days after receipt. If payment is not made within such time, the unpaid balance shall bear interest monthly at the rate of twelve percent (12%) per annum or the maximum contract rate permitted by the applicable usury laws…plus attorney's fees, court costs, and other costs in connection with the collection of unpaid amounts.

TXSO has failed and refused to pay its proportionate share of the operating expenses on both the WD 34 Property and the HI 552 Property since January 1, 2004. *See Innes Affidavit.*

28.    Paragraph 4 of Exhibit "A" to the Operating Agreements evidences the fact that such expenses must be paid, even if the working interest owner thinks they may be in error. This paragraph provides, in pertinent part, that:

> Payment of any such bills shall not prejudice the right of any Non-Operator to protest or question the correctness thereof; provided, however, all bills and statements rendered to Non-Operators by Operator during any calendar year shall be conclusively be presumed to be true and correct after twenty-four (24) months following the end of any such calendar year….

29.    These provisions clearly evidence that a non-operator must pay the bills and expenses as they become due. TXSO has failed and refused to make any payments on the WD 34 Property or the HI 552 Property from January 1, 2004 to the present.[5] *See Innes Affidavit.*

---

[5] As set forth, *supra*, FOC and MERI have proven that TXSO breached the Operating Agreements under Louisiana law. See *Bond v Allemand,*, 632 So.2d at 326, 328 (La Ct App.1993), *writ denied*, 637 So.2d 468 (La.1994). TXSO also breached the agreements under Texas law. The elements of a breach of contract claim in Texas are (1) a valid contract, (2) the plaintiff performed or tendered performance; (3) the defendant breached the contract, and (4) the

30.     FOC and MERI have proven the existence of the Operating Agreements, the fact that FOC and MERI performed under the contract, and that TXSO failed to pay its share of operating expenses.  TXSO owes $839,646.00 as a result of the breach.  *See Innes Affidavit.* Thus, FOC and MERI are entitled to a summary judgment that TXSO breached the Operating Agreements by failing to pay the operating expenses when due and that TXSO owes operating expenses on (1) the HI 552 Property from January 1, 2004 to the present; (2) the No. 8 Well on the WD 34 Property from January 1, 2004 to April 1, 2004; and, (3) all other wells on the WD 34 Property from January 1, 2004 to the present.

## E.     MERI's Claim for Breach of Contract on the Gas Balancing Agreement

31.     FOC, MERI, Noble/Coldren, and TXSO are or were parties to a Gas Balancing Agreement ("GBA").  The GBA is attached as Exhibit "C" to the HI 552 Operating Agreement and contains provisions regarding obtaining volumetric gas balance upon a permanent cessation of production.  *See, GBA, Para. 3, attached to Exhibit 2 of Hess Affidavit.*

32.     The HI 552 Property ceased production on or about June 2, 2005.  *See Smith Affidavit.*  In accordance with Paragraph 3.3 of the GBA, the Overproducer (the party who has received more gas than that to which it is entitled) must pay the Underproducer (the party who has not received as much gas as it is entitled to receive) for the value of the gas by which it was overproduced.  *Id.*  Paragraph 3.1 of the GBA provides, in pertinent part, that:

---

plaintiff was damaged as a result of the breach.  *Keszler v. Mem'l Med. Ctr. of E. Tex.*, 105 S.W.3d 122, 128 (Tex. App.-Corpus Christi 2003, no pet.)

> If all parties have not achieved volumetric gas balance in all categories upon termination of the Operating Agreement or upon a permanent cessation of all gas production from any lease thereunder, Operator shall furnish within thirty (30) days to all parties a statement showing the final Cumulative Overproduction (the amount by which the cumulative volume of gas taken by a party within a particular category of gas is less than the cumulative volume that party was entitled to take within such category according to its working interest) and Cumulative Underproduction (the amount by which the cumulative volume of gas taken by a party within a category of gas exceeds the cumulative volume that party was entitled to take within such category according to its working interest) of each party by category, and the month and year in which it accrued...

33.     The monthly statements showing the Cumulative Overproduction and Underproduction established that TXSO was overproduced and MERI was underproduced. *Id.* MERI made demand upon TXSO to pay the amount it was overproduced in accordance with the terms of the GBA. *Id.* TXSO refused to make such payment. *Id.*

34.     Because TXSO was the Overproducer and received 19,669 mcf (working interest)/16,391 mcf (net revenue interest) at the average price of $4.388/mcf, TXSO must pay MERI, the Underproducer. *Id.* TXSO has refused to make payment and is in breach of Paragraph 3.3 of the GBA. Accordingly, MERI is entitled to a summary judgment on its breach of contract claim and is entitled to damages in the amount of the Overproduction, or $71,932.00. *Id.*

## F.     FOC's Claim for Unjust Enrichment

35.     FOC inadvertently sent TXSO $73,436.00 in revenue on the No. 8 Well and $102.00 in revenue on the No. 12 Well as though it had an interest in such wells. *See Innes Affidavit.* Since TXSO admitted that it did not consent to the April AFE, it does not have an

interest in these wells. *See Exhibit 14 to Hess Affidavit.* TXSO has retained this money even though it has no right to do so. Accordingly, TXSO has been unjustly enriched[6] in the total sum of $73,538.00 for which FOC now seeks recovery.

### G.    No Evidence of Gross Negligence

36.    Paragraph 16.3 of both the WD 34 and HI 552 Operating Agreements contains an exculpatory clause which provides protection to the operator (in this case, FOC and/or MERI) of the properties. These paragraphs provide, in pertinent part, that:

> Operator shall not be liable for loss, damage or destruction to any property of Non-Operators in connection with operations hereunder for the Joint Account on The Property, except those arising out of willful misconduct or gross negligence of Operator.

37.    The Fifth Circuit has held that exculpatory clauses in Operating Agreements such as the one in the case at bar protect the operator from liability for **any** act taken in the capacity of operator if authorized by the JOA (expect for gross negligence or willful misconduct), whether the conduct at issue is connected with "administrative acts or physical operations." *Stine v. Marathon Oil Co.*, 976 F.2d 254, 267 (5th Cir. 1992). As such, in order for TXSO to prevail on any of the claims against FOC, MERI, or MEI, TXSO must prove that the acts were done in a grossly negligent manner or with willful misconduct. TXSO cannot do so, as there is no evidence of gross negligence on the part of FOC, MERI or MEI.

---

[6] FOC and MERI are entitled to recover for unjust enrichment under Louisiana law as 1) there has been an enrichment to TXSO; 2) FOC and MERI have been "impoverished"; 3) "there is a connection between the enrichment and resulting impoverishment"; 4) there is no "justification" for the enrichment; and 5) there is no other remedy available to FOC and MERI. See, *Baker v Maclay Properties Co.*, 648 So.2d 888, 897 (La. 1995) (outlining the elements of a claim for unjust enrichment). Similarly, FOC and MERI can recover under Texas law as TXSO obtained the benefit of the money by taking undue advantage of FOC and MERI. See, *Heldenfels Bros., Inc. v. City of Corpus Christi*, 832 S.W.2d 39, 41 (Tex. 1992) (A party may recover under an unjust enrichment theory when one person has obtained a benefit from another by fraud, duress, or the taking of an undue advantage.)

38.     In *Stine*, the plaintiff claimed that the operator of the property at issue breached duties owed him under the Joint Operating Agreement ("JOA"), tortiously interfered with a gas sale contract, and that the operator, by failing to drill exploratory wells, wrongfully abandoned a portion of the lease acreage. *Stine*, 976 F.2d at 257. The plaintiff prevailed at the trial court level, where the court found that the exculpatory clause did not require a finding of gross negligence or willful misconduct, and the defendant/operator appealed. *Id.*

39.     The main issue on appeal was the reach of the exculpatory clause contained in the JOA. *Id.* The exculpatory clause at issue in *Stine* is as follows:

> It shall conduct all such operations in a good and workmanlike manner, but it shall have no liability as Operator to the other parties for losses sustained or liabilities incurred, except as may result from gross negligence or willful misconduct....

40.     The Fifth Circuit determined that the operator was <u>not</u> liable for any action taken in connection with the completion, testing or turnover, of any well drilled under the provisions of the JOA, unless the nonoperator could prove that the operator's actions were grossly negligent or willful. *Stine*, 976 F.2d at 261. The Fifth Circuit then stated, "This protection extends to Marathon's [operator] various administrative and accounting duties, including the recovery of costs under the authority of the JOA." *Id.; See also Caddo Oil Co. v. O'Brien*, 908 F.2d 13, 17 (5th Cir. 1990) (Caddo, as operator, was excused from accounting to nonoperator for charges for operations and was not held to a fiduciary standard because the operating agreement made operator "liable to the Owners only in cases of the Operator's willful misconduct.")

19

41.     The holding in *Stine* was recently noted in *PYR Energy Corp. v. Samson Resources Co.*, 470 F. Supp.2d 709 (E.D. Tex. 2007). In this case, the plaintiff non-operator sued the operator for breach of contract. *Id.* at 712. The operator defended the action on several grounds, including relying upon the exculpatory provision contained in the Purchase and Sale Agreement ("PSA"). *Id.* at 723. The exculpatory clause at issue in *PYR Energy Corp.* follows:

> Operator ... shall conduct all operations in a good and workmanlike manner, but it shall have no liability as Operator to the other parties for losses sustained or liabilities incurred, except such as may result from gross negligence or willful misconduct.

*Id.*

42.     The non-operator claimed that intervening Texas precedent[7] on the reach of exculpatory clauses should govern the action and that the recent precedent indicates that an operator is obligated to perform every activity "in a good and workmanlike manner," and would incur liability for any breach of this standard except in situations, such as drilling and operating a well, where a plaintiff would be required to show gross negligence or willful misconduct. *Id.* at 725. The District Court disagreed stating that, "[T]his trial court surely is as bound to follow prior circuit precedent [*Stine*] as are subsequent panels of the circuit court of appeals." *Id.*

43.     The case law is clear that the exculpatory provision in the WD 34 and HI 552 Operating Agreements requires that TXSO prove that FOC, MERI and/or MEI were grossly

---

[7] Most of TXSO's claims arise under the WD 34 Operating Agreement which is governed by Louisiana law. However, a portion of TXSO's claim that it was not billed properly arises under the HI 552 Operating Agreement which is governed by Texas law. In *Caddo*, a case decided under Louisiana law, the Fifth Circuit determined that the operator is liable to the owners "only in cases of the Operator's willful misconduct, including" administrative duties. *Caddo*, 908 F.2d at 17.

negligent in order to prevail on any of its claims. FOC, MERI and/or MEI seek a finding to this effect.

44.     There is no evidence of gross negligence on the part of FOC, MERI or MEI. Under Louisiana law, gross negligence is defined as "the want of even slight care and diligence and the want of that diligence which even careless men are accustomed to exercise." *Brown v. Lee,* 929 So. 2d 775, 778 (La. Ct. App. 1996) (*citing State v. Vinzant,* 7 So.2d 917 (La. 1942)). Under Texas law, gross negligence means an act or omission "which when viewed objectively from the standpoint of the actor at the time of its occurrence involves an extreme degree of risk, considering the probability and magnitude of the potential harm to others, and of which the actor has actual, subjective awareness of the risk involved, but nevertheless proceeds with conscious indifference to the rights, safety, or welfare of others." *Tex. Civ. Prac. & Rem. Code* §41.001(11).

45.     TXSO cannot meet its burden and establish any evidence of gross negligence on the part of FOC, MERI and MEI. Summary judgment is mandated if TXSO "fails to make a showing sufficient to establish the existence of an element essential to his case on which he bears the burden of proof at trial." *Whitmire v. Terex Telect, Inc.,* 390 F.Supp.2d 540, 548 (E.D. Tex. 2005) (*citing Nebraska v. Wyoming,* 507 U.S. 584, 590 (1993)). TXSO's burden is "not satisfied by 'some metaphysical doubt as to material facts,' conclusory allegations, unsubstantiated assertions, speculation, the mere existence of some alleged factual dispute, or 'only a scintilla of evidence.'" *Whitmire,* 390 F.Supp.2d at 547, 548 (*citing Little v. Liquid Air Corp.,* 37 F.3d 1069, 1075 (5th Cir. 1994)).

46.   FOC, MERI and MEI are entitled to a finding that a gross negligence standard applies to all causes of action asserted by TXSO and a summary judgment that there is no evidence of gross negligence.

**H.   TXSO's Accounting Claim Time Barred**

47.   TXSO alleges that FOC, MERI and MEI erroneously billed operating expenses to TXSO under the WD 34 and HI 552. TXSO also claims that FOC, MERI and MEI employed an improper "allocation system" for expenses under these Agreements. TXSO seeks an accounting of all the revenues and expenses associated with the Operating Agreements.

48.   Under the COPAS procedures attached as Exhibit "A" to the Operating Agreements, all bills and statements rendered to TXSO were presumed to be true and correct after twenty-four (24) months following the end of any calendar year unless TXSO submitted written exceptions and made a claim for adjustment within the twenty-four month period. *See Exhibits 1 and 2 to Hess Affidavit.* Paragraph 4 of Exhibit "A" to the Operating Agreements state as follows.

> 4. Adjustments
>
> Payment of any such bills shall not prejudice the right of any Non-Operator to protest or question the correctness thereof; provided, however, all bills and statements rendered to Non-Operators by Operator during any calendar year shall conclusively be presumed to be true and correct after twenty-four (24) months following the end of any such calendar year, unless within the said twenty-four (24) month period a Non-Operator takes written exception thereto and makes claim on Operator for Adjustment.

49.   TXSO had the right to question FOC, MERI and MEI's records as long as it did so by providing notice in writing within the twenty-four month period noted above. TXSO never

22

made any written exceptions. Thus, the bills and statements for the years 2001 through 2004 are

conclusively presumed to be true and correct and there can be no accounting, *See Calpetco 1981*

*v. Marshall Exploration, Inc.*, 989 F.2d 1408, 1416 (5th Cir. 1993) (holding that under identical

COPAS provision, party challenging overcharges was required to show compliance with the

contract to avert summary judgment); *In re Antweil*, 115 B.R. 299, 305 Bankr. N.M. (holding that

party to operating agreement containing identical COPAS provision was precluded from

challenging overcharges by failing to provide the required written notice to the operator); *Woods*

*Petroleum Corp. v. Hummel*, 784 P.2d 242, 244 (Wyo. 1989) (holding that identical COPAS

provision precluded legal challenge to accounting when non-operator failed to provide notice as

required by the COPAS provision).

     50.    Paragraph 5 of Exhibit "A" to the Operating Agreements, which governs requests

for audits, also precludes TXSO from an accounting for the years 2001 through 2004. This

paragraph provides, in pertinent part, that:

> 5. Audits
>
> A Non-Operator, upon notice in writing to Operator and all other Non-Operators, shall have the right to audit Operator's accounts and records relating to the Joint Account for any calendar year within the twenty-four (24) month period following the end of such calendar year; provided, however, the making of an audit shall not extend the time for the taking of written exception to and the adjustment of accounts as provided for in Paragraph 4 of this Section I. Where there are two or more Non-Operators, the Non-Operators shall make every reasonable effort to conduct joint or simultaneous audits in a manner which will result in a minimum of inconvenience to the Operator. Operator shall bear no portion of the Non-Operators' audit cost incurred under this paragraph unless agreed to by the Operator.

     51.    TXSO never provided such notice and its right to an accounting through 2004 is

time barred. *Cf. Willard Pease Oil and Gas Co. v. Pioneer Oil and Gas Co.*, 899 P.2d 766,

774 (Utah 1995) (interpreting identical COPAS provision as limiting an audit to a maximum of three years, assuming proper notice is given).

52.     Since there is no evidence that TXSO complied with Paragraphs 4 or 5 of Exhibit "A" to the Operating Agreements, TXSO's claims for alleged erroneously billed operating expenses, an alleged improper "allocation system," and request for an accounting are time barred for the years 2001 through 2004.

## I.     Attorneys' Fees, Costs and Compound Interest

53.     FOC, and MERI seek recovery of the reasonable and necessary attorneys' fees in the amount of $382,377.50 and costs in the amount $41,046.19 incurred in bringing this action per the terms of the Operating Agreements (as well as any applicable law) as evidenced by the Affidavit of Bradley L. DeLuca.

54.     FOC and MERI also seek recovery of compound interest at the rate of 12% per annum (and/or the maximum contract rate permitted by law) in addition to Court costs and other costs per the terms of the Operating Agreements and case law.  See *Exxon Corp. v. Crosby-Mississippi Resources, Ltd.* 40 F.3d 1474, 1488-1489 (5th Cir.1995);  *Texon Energy Corp. v. Dow Chem Co.* 733 S.W.2d 328 (Tex.App.—Houston [14th Dist.] 1987, writ ref'd n.r.e.)

WHEREFORE, Defendant/Counter-Plaintiffs Forest Oil Corporation and Mariner Energy Resources, Inc. and Defendant Mariner Energy, Inc., request that this motion be granted in its entirety and that the Court grant them such other and further relief, both at law or in equity, to which they may show themselves justly entitled.

24

Respectfully submitted,

By:   /s/   Bradley L. DeLuca
          Bradley L. DeLuca
          Federal Bar No. 11510
          TBA No. 05653800
          Brigid D. Ashcraft
          TBA No. 01372450
          Federal Bar No. 9033

OF COUNSEL:

JOHNSON DELUCA KENNEDY & KURISKY, P.C.
1221 Lamar, Suite 1000
Houston, Texas 77010
(713) 652-2525 - Telephone
(713) 652-5130 - Facsimile

25

## CERTIFICATE OF SERVICE

I hereby certify that on the 20th day of July, 2007, a true and correct copy of the foregoing document has been delivered in a manner prescribed by the Federal Rules of Civil Procedure to:

Francis I. Spagnoletti
David S. Toy
Spagnoletti & Co.
401 Louisiana, 8th Floor
Houston, Texas 77002

Lawrence Labanowski
Lawrence F. Labanowski & Associates
3939 Essex lane, Suite 600
Houston, Texas 77027

Paul D. Clote
Paul D. Clote & Associates
4 Houston Center
1221 Lamar, Suite 1090
Houston, Texas 77010

Robert J. Sergesketter
Apache Corporation
2000 Post Oak Blvd., Suite 100
Houston, Texas 77056

　　　　　　　　　　　　　　 /s/ Bradley L. DeLuca
　　　　　　　　　　　　　　Bradley L. DeLuca

26