**IN THE UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
GALVESTON DIVISION**

| | |
|---|---|
| TEXAS STANDARD OIL COMPANY, | ' |
| Plaintiff, | ' |
| vs | ' CIVIL ACTION NO. G-05-490 |
| | ' JURY DEMAND |
| FOREST OIL CORPORATION, | ' |
| Defendant. | ' |

### NOBLE ENERGY, INC. AND COLDREN RESOURCES, LP'S RULE 56 MOTION FOR SUMMARY JUDGMENT

TO THE HONORABLE UNITED STATES DISTRICT COURT JUDGE:

Defendant/Counter-Plaintiff Noble Energy, Inc. ("Noble"), and Defendant/Counter-Plaintiff Coldren Resources, LP ("Coldren"), (collectively "Movants") file their Motion for Summary Judgment, pursuant to Rule 56, Fed. R. Civ. P., and in support thereof would show as follows:

**I.   Introduction**

1.   On or about September 7, 2005, Texas Standard Oil Company ("TXSO") brought suit against Forest Oil Corporation ("FOC"). In its suit, TXSO asserted claims for breach of contract, declaratory relief and for an accounting under two Offshore Operating Agreements between the parties.

2.   On or about September 26, 2006, Noble and Coldren were joined in this lawsuit and both timely filed their Original Answer and Counterclaim on or about November 14, 2006. Noble and Coldren amended their Counterclaim on or about April 27, 2007.

3.   Noble and Coldren now seek summary judgment on all claims they have asserted

against TXSO in that they are entitled to judgment as a matter of law on undisputed facts. Noble and Coldren also seek summary judgment on the basis that TXSO cannot make a showing sufficient to establish the existence of an element essential to its case on which it bears the burden of proof at trial.

## II.     Brief Factual Background

4.      The parties' dispute arises out of the Offshore Operating Agreements covering properties located offshore Louisiana and Texas. The property offshore Louisiana is known as the West Delta 34 property (the "WD 34 Property"). The property offshore Texas is known as the High Island 552 property (the "HI 552 Property"). There is a separate Operating Agreement for each property, but the terms of the agreements are virtually identical.[1] A true and correct copy of the Operating Agreement for each property is attached to the Hess Affidavit as Exhibit "1" (the "WD 34 Operating Agreement") and Exhibit "2" (the "HI 552 Operating Agreement") as those exhibits are named in Forest Oil Corporation, Mariner Energy Resources, Inc. ("MERI") and Mariner Energy Inc.'s ("MEI") Rule 56 Motion for Summary Judgment, all of which motion or related attachments are incorporated herein by reference as if fully put forth verbatim (see Section IV.10 below).

5.      At various relevant times, FOC, MERI, Apache Corporation ("Apache"), Pioneer Natural Resources USA, Inc. ("Pioneer"), Noble, Coldren, and TXSO are or were parties to the Operating Agreement covering the WD 34 Property. FOC, MERI, Noble, Coldren and TXSO are

---

[1] The WD 34 Property is adjacent to the State of Louisiana and the HI 552 Property is adjacent to the State of Texas. Pursuant to the Outer Continental Shelf Lands Act ("OSCLA") 43 U.S.C. §§1333(a)(2)(A) and case law interpreting same, Louisiana law applies to the WD 34 Operating Agreement and Texas law to the HI 552 Operating Agreement. *See*, *Union Texas Petroleum Corp. v. PLT Engineering, Inc.*, 895 F.2d 1043, 1047 (5th Cir. 1990); *Wooten v. Pumpkin Air, Inc.,* 869 F.2d 848, 852 (5th Cir. 1989). The adjacent state's law applies even if there is a provision in the Operating Agreement designating another state's law. *Union Texas Petroleum Corp.,* 895 F.2d at 1050.

or were parties to the Operating Agreement covering the HI 552 Property. FOC was the operator of both of the properties until MERI became the operator following FOC's assignment of its interest to MERI.

6.    At the core of this dispute are the Operating Agreements, and the attachments to those agreements. More specifically, the instant dispute concerns the rights and obligations of the parties under the WD 34 Operating Agreement due to the cessation of production on the No. 8 Well located on the WD 34 Property. The dispute also concerns the permanent cessation of production on the HI 552 Property and the parties' obligations under the Gas Balancing Agreement, which is Exhibit "C" to the HI 552 Operating Agreement. Lastly, the dispute concerns the non-payment by TXSO of operating expenses due per the terms of the Operating Agreements on the HI 552 Property and the WD 34 Property.

7.    The facts necessary to render a summary judgment as to Noble and Coldren's claims are not in dispute, and TXSO can assert no facts to defeat Noble and Coldren's motion for summary judgment. Further, the Operating Agreements from which the claims arise are not ambiguous, nor has any party claimed ambiguity. Noble and Coldren are entitled to summary judgment as a matter of law as set forth herein.

### III.    Standard for Summary Judgment

8.    Summary judgment is proper if the evidence shows that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. *Kee v. City of Rowlett,* 247 F.3d 206, 210 (5th Cir. 2001). The moving party has the initial burden of establishing that there are no issues of material fact and that it is entitled to judgment in its favor as a matter of law. See *Rivera v. Houston Indep. Sch. Dist.,* 349 F.3d 244, 246-47 (5th Cir. 2003).

Once the moving party establishes that there is no genuine issue, the burden shifts to the nonmoving party to produce evidence of the existence of a genuine issue for trial. *Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986).* The nonmoving party cannot rely only upon allegations, denials in a pleading, or unsubstantiated assertions that a fact issue exists, but must "set forth specific facts showing the existence of a 'genuine' issue concerning every essential component of its case." *Morris v. Covan World Wide Moving, Inc.,* 144 F.3d 377, 380 (5th Cir. 1998). The evidence presented by the nonmoving party must be significant and probative to prevent summary judgment. *Union Planters Nat'l. Leasing Inc. v. Woods,* 687 F.2d 117 (5th Cir. 1982).

9. Interpretation of an unambiguous contract is a matter of law to be decided by the court. *Holt Oil & Gas Corp. v. Harvey*, 801 F.2d 773, 780 (5th Cir. 1986) (*citing Southern Natural Gas Co. v. Pursue Energy*, 781 F.2d 1079, 1081 (5th Cir. 1986)). *See also Mobil Exploration & Producing U.S., Inc. v. Certain Underwriters Subscribing to Cover Note 95-3317(A)*, 837 So.2d 11, 23-24 (La. Ct. App. 2002) ("Contracts have the effect of law for the parties….When a contract can be interpreted from the four corners of the instrument, the question of contractual interpretation is answered as a matter of law, and summary judgment is appropriate."); *Coker v. Coker*, 650 S.W.2d 391, 393 (Tex. 1983) (stating that a court may construe a contract as a matter of law if it is unambiguous and can be given a certain or definite legal meaning or interpretation.)

**IV. Summary Judgment Evidence**

10. Noble and Coldren's Motion for Summary Judgment is supported by the summary judgment evidence attached to Forest Oil Corporation, Mariner Energy Resources, Inc., and Mariner Energy, Inc.'s Rule 56 Motion for Summary Judgment, and is incorporated herein by

reference. TXSO's claims against all defendants herein are based on similar facts. Noble and Coldren have thus asserted similar defenses, affirmative defenses, and counterclaims as FOC, MERI, and MEI. FOC, MERI, and MEI have filed their motion for summary judgment under Rule 56, Fed. R. Civ. P. based upon defenses, affirmative defenses, and counterclaims that Noble and Coldren have also asserted. Noble hereby incorporates by reference for all purposes FOC, MERI, and MEI's Rule 56 Motion for Summary Judgment, and the summary judgment evidence filed therewith. Noble and Coldren's Rule 56 Motion for Summary Judgment is also supported by the Affidavit of John Nedelka, attached hereto as Exhibit "1", and the Affidavit of Lawrence F. Labanowski in Support of Attorney's Fees, attached hereto as Exhibit "2".

**V.    Undisputed Facts**

11.   The following undisputed facts support this Motion:

- The No. 8 Well on the WD 34 Property ceased production on or about February 28, 2004. *See Hess Affidavit*. ("Hess Affidavit" refers to the Hess Affidavit attached to FOC, MERI, and MEI's Rule 56 Motion for Summary Judgment.)

- At that time, FOC owned a 38.31% working interest in the WD 34 Property, TXSO owned a 30% working interest, Apache owned an 8.34% working interest, Noble owned an 8.34% working interest and Pioneer owned a 15% working interest. *See Exhibit 1 to Hess Affidavit*.

- At the time the No. 8 Well ceased production, it was the sole producing well on the WD 34 Property. *See Hess Affidavit*.

- Under the terms of the WD 34 lease, the lease would expire one hundred eighty (180) days after the cessation of production, or August 28, 2004. *See Hess Affidavit*.

- FOC sought to determine the cause of the cessation of production, the prudent manner in which to re-establish production, and the approximate costs associated therewith. *See Hess Affidavit*.

- On or about March 19, 2004, FOC forwarded to TXSO, Apache, Pioneer, and Noble AFE No. 042358 (the "March AFE"). The e-mail and the attached AFE notified the working interest owners that the No. 8 Well had ceased production, that the tubing on the well needed to be replaced, that

the well would be set up for future re-completion in two selective sands and that, per the terms of the Operating Agreement, the owners had thirty (30) days in which to elect to participate in the lease maintenance operation.  *See Exhibit 3 to Hess Affidavit.*

- On or about March 30, 2004, Apache executed and returned the March AFE.  *See Exhibit 4 to Hess Affidavit.*

- On or about April 12, 2004, FOC advised the working interest owners that the proposed future re-completion plan to the No. 8 Well, but not the work-over plan, had changed in scope and that FOC recommended, in addition to replacing the tubing, future re-completion in a different sand. The e-mail also notified the owners that the re-completion plan set forth in the March AFE would not go forward.  *See Exhibit 5 to Hess Affidavit.*

- On or about April 13, 2004, FOC sent AFE No. 042358 (the "April AFE") to the working interest owners which included the new re-completion plan.  *See Exhibit 6 to Hess Affidavit.*

- Only Apache, with 8.34% working interest, executed the March AFE before it was withdrawn.  *See Hess Affidavit.*

- Apache, Pioneer, and Noble executed and returned the April AFE.  *See Exhibits 7, 8, and 9 to Hess Affidavit.*

- TXSO, on the other hand, executed and returned the March AFE.  *See Exhibit 10 to Hess Affidavit.*

- FOC notified TXSO that it had executed the wrong AFE and requested that TXSO execute the April AFE. TXSO never responded to this e-mail and never executed the April AFE.  *See TXSO's Response to Request for Admission* No. 5.  *See also Exhibit 11 to Hess Affidavit.*

- On or about April 23, 2004, the re-completion plan as set forth in the April AFE went forward.  *See Hess Affidavit.*

- On or about October 18, 2004, FOC sent the working interest owners AFE No. 0424358 (the "October AFE") to further re-complete the No. 8 Well.  *See Exhibit 12 to Hess Affidavit.*

- Apache, Pioneer and Noble executed the October AFE. However, by letter dated November 5, 2004, TXSO informed FOC that, "with respect to your pending AFE, Texas Standard, as a non-consenting party should not have been included on this AFE. We remain in a non-consent status in this well at this time."  *See Exhibit 13 to Hess Affidavit.*

- A Farmout Agreement was entered into by all working interest owners with Helis Oil & Gas Co., L.L.C. effective February 25, 2004 and was not fully executed until April 19, 2004.  *See Exhibit 14 to Hess Affidavit.*

- Paragraph 2.1 of the Farmout Agreement provides that the failure to commence drilling shall cause the agreement to terminate in its entirety.

- A Farmout Agreement is not a lease maintenance operation. *See TXSO's answer to Interrogatory No. 23.*

- The No. 12 Well, drilled pursuant to the Farmout Agreement, began producing in August, 2004. *See Hess Affidavit.*

- Section 8.21 of the WD 34 Operating Agreement provides that a party electing not to participate in a lease maintenance operation will assign to the participating parties in the proportions in which they participate therein, all of its right, title and interest in such lease, or the affected portion thereof, free and clear of any burdens thereon as provided in Paragraph 8.16, retaining, however, its interest in and production from previously completed wells which are producing, shut-in, or temporarily abandoned. *See Exhibits 1 to Hess Affidavit.*

- As a result of TXSO's failure to consent to a designated lease maintenance operation in the AFE the interest that TXSO would have had in the No. 12 Well was apportioned among the other working interest owners. *See Hess Affidavit.*

- TXSO refused to assign to the other working interest owners the interest that it lost per Section 8.21 of the WD 34 Operating Agreement. *See Hess Affidavit. See TXSO's Response to Request for Admission No. 9.*

## VI.   Claims on Which Movants are Entitled to Summary Judgment

12.   For ease of reference of the Court, Movants summarize their grounds for summary judgment as follows:

### A.   Breach of Contract/Specific Performance

Noble and Coldren are entitled to judgment that TXSO breached the WD 34 Operating Agreement by failing to assign its interest in the WD 34 Property to the other working interest owners, other than its interest in and production from previously completed wells which are producing, shut-in, or temporarily abandoned.

### B.   Declaratory Relief

Noble and Coldren are entitled to a declaratory judgment that:

- The re-completion plan on the No. 8 Well was the lease maintenance

- operation for the WD 34 Property under the terms of the WD 34 Operating Agreement;

- No aspect of the Farmout Agreement constituted a lease maintenance operation for the WD 34 Property under the terms of the WD 34 Operating Agreement;

- The April AFE was sent in conformance with the requirements of the WD 34 Operating Agreement and the work was authorized by the other working interest owners and performed in accordance with the terms of the WD 34 Operating Agreement;

- TXSO has no right, title or interest in the WD 34 Property (other than TXSO's interest in and obligations related to production from wells completed prior to April 1, 2004 which are producing, shut-in or temporarily abandoned); and,

- TXSO must execute assignments of its right, title and interest in the WD 34 Property to the other working interest owners (other than TXSO's interest in and obligations related to production from wells completed prior to April 1, 2004 that are producing, shut-in or temporarily abandoned).

- TXSO has failed to balance gas volumes with respect to the High Island 552 Property under the applicable Gas Balancing Agreement, and is thus obligated to Noble and Coldren for the value of such overproduction and resulting gas imbalance.

**C.   Breach of Contract for Operating Expenses**

Noble and Coldren are entitled to a judgment that TXSO breached both the WD 34 and HI 552 Operating Agreements by failing to pay its proportionate share of the operating expenses.

**D.   Breach of the Gas Balancing Agreement**

Noble and Coldren are entitled to judgment that TXSO breached the Gas Balancing Agreement made a part of the HI 552 Operating Agreement by taking and receiving greater quantities of produced gas than to which they were entitled.

**E.   Unjust Enrichment**

Noble and Coldren are entitled to a judgment that it recover from TXSO sums TXSO was unjustly enriched as a result of erroneous payments of revenue to TXSO on the No. 8 Well and the No. 12 Well on the WD 34 Property.

**VII.   Arguments and Authorities**

   **A.   <u>Claims for Breach of Contract and Specific Performance</u>**

   13.   Noble and Coldren are entitled to summary judgment for specific performance as a matter of law under the undisputed facts even though they are non-operators. FOC, as operator, had responsibility for the management, operation, exploration and development of the WD 34 Property for the benefit of all working interest owners. *See Exhibit 1 to Hess Affidavit*. In discharge of these duties, upon the cessation of production on the No. 8 Well (the only producing well on the WD 34 Property at that time), FOC followed the terms of the WD 34 Operating Agreement and undertook steps to save the lease from expiring. *See Hess Affidavit.* Specifically, FOC sought to determine the cause of the cessation of production, the prudent manner in which to re-establish production and the approximate costs associated therewith, all of which were done knowing that the operation was necessary to save the lease from expiring. *See Hess Affidavit.*

   14.   FOC determined that it was necessary to replace the tubing in the No. 8 Well and recommended set up for future re-completion in two selective sands. Accordingly, FOC sent out an e-mail and the March AFE on March 19, 2004, indicating the work necessary to attempt to re-gain production in the No. 8 Well and further notifying the parties that the proposal was a lease maintenance operation. *See Exhibit 3 to Hess Affidavit*.

   15.   On April 12 and 13, 2004, FOC withdrew the March AFE and replaced it with the April AFE.[2] *See Exhibit 4 to Hess Affidavit* The only change recommended by FOC in the April

---

[2] The WD 34 Operating Agreement does <u>not</u> prohibit the withdrawal of an AFE. Despite TXSO's position to the contrary, each of the other working interest owners, including Apache, acknowledged the right of FOC to withdraw the March AFE.

9

AFE was to set up the future re-completion in a single, different sand. *See Hess Affidavit.* Otherwise, the proposal did not change. *Id.*

16.   At the time the March AFE was withdrawn, only Apache, with an 8.34% working interest, had executed the March AFE. Thus, the AFE was withdrawn prior to acceptance by a majority in interest (*i.e.,* greater than 50%) as required by the WD 34 Operating Agreement. *See Exhibit 1 to Hess Affidavit.* Significantly, TXSO did not execute the March AFE until April 16, 2004, four days after it was withdrawn by FOC. *See Exhibit 10 to Hess Affidavit.*

17.   Following withdrawal of the March AFE and the working interest owners' receipt of the April AFE, Noble, Pioneer and Apache each executed and consented to the April AFE. *See Exhibit 7, 8 and 9 to Hess Affidavit.* TXSO did not consent to the April AFE, which was a designated lease maintenance operation under the WD 34 Operating Agreement. *See Hess Affidavit.* In fact, TXSO subsequently sent FOC a letter declaring "we remain in a non-consent status in this well at this time." *See Exhibit 12 to Hess Affidavit.* Since the majority in interest consented to the lease maintenance operation contained in the April AFE, the work outlined in the proposal began on or about April 23, 2004, well within the one hundred eight (180) day time period under the WD 34 lease.

18.   FOC followed the requirements of the WD 34 Operating Agreement and the agreement is not ambiguous. Interpretation of an unambiguous contract is a matter of law for the court and courts are bound to enforce the contract as written. *Holt Oil & Gas Corp.,* 801 F.2d at 78, *citing, Cooper v. Olinde*, 565 So. 2d 978, 983 (La. App. 1st Cir.), writ denied, 569 So.2d 966 (La. 1990). As such, the Court must enforce paragraph 8.21 of the WD 34 Operating Agreement which provides, in pertinent part, that:

> A lease maintenance operation is defined for the purposes of this paragraph as one required to maintain the Property or a portion thereof, at its expiration date or otherwise. ***A party electing not to participate in a lease maintenance operation will assign to the participating parties in the proportions in which they participate therein, all of its right, title and interest in such lease, or the affected portion thereof, free and clear of any burdens thereon as provided in Paragraph 8.16,*** retaining, however, its interest in and production from previously completed wells which are producing, shut-in, or temporarily abandoned.

*See Exhibit 1 to Hess Affidavit.* (Emphasis Added)

19. The recompletion of the No. 8 well was a lease maintenance operation under Paragraph 8.21, and TXSO elected not to participate. Therefore, Noble and Coldren are entitled to a summary judgment that TXSO breached the foregoing Paragraph 8.21 of the Operating Agreement. Further, Noble and Coldren are entitled to a summary judgment that TXSO breached Paragraph 8.21 of the WD34 Operating Agreement and to specific performance that TXSO assign them their proportionate interest in such lease, retaining, however, its interest in and production from previously completed wells which are producing, shut-in, or temporarily abandoned, as the remedy of specific performance is the preferred remedy for breach of contract. *J. Weingarten, Inc. v. Northgate Mall, Inc.*, 404 So.2d 896, 899-901(La. 1981).

### B. Claims for Declaratory Relief

20. Noble and Coldren also seek a summary judgment pursuant to the Federal Declaratory Judgment Act, 28 U.S.C. §2201, *et seq.* Based upon the undisputed facts, Noble and Coldren are entitled to the following declarations:

(a) The re-completion plan on the No. 8 Well was the lease maintenance operation for the WD 34 Property under the terms of the WD 34 Operating Agreement;

(b) No aspect of the Farmout Agreement or the drilling of the No. 12 Well constituted a lease maintenance operation for the WD 34 Property under the terms of the WD

        34 Operating Agreement;

(c)     The April AFE was sent in conformance with the requirements of the WD 34 Operating Agreement and the work was authorized by the other working interest owners and performed in accordance with the terms of the WD 34 Operating Agreement;

(d)     TXSO has no right, title or interest in the WD 34 Property (other than TXSO's interest in and obligations related to production from wells completed prior to April 1, 2004, which are producing, shut-in or temporarily abandoned);

(e)     TXSO must execute an assignment of its right, title and interest in the WD 34 Property (other than TXSO's interest in and obligations related to production from wells completed prior to April 1, 2004 that are producing, shut-in or temporarily abandoned) to the other working interest owners; and

(f)     TXSO has failed to balance gas volumes under the Gas Balancing Agreement with respect to Counter-Plaintiffs and is thereby obligated to Noble and Coldren for the value of such overproduction and resulting gas imbalance.

**C.**     **Claim for Breach of Contract for Failure to Pay Operating Expenses**

21.     Each of the working interest owners must pay its proportionate share of other operating expenses resulting from the operation of the properties at issue as set forth in Paragraph 3 to the Operating Agreements which provides:

> Each Non-Operator shall pay its proportion of all bills within fifteen (15) days after receipt. If payment is not made within such time, the unpaid balance shall bear interest monthly at the rate of twelve percent (12%) per annum or the maximum contract rate permitted by the applicable usury laws…plus attorney's fees, court costs, and other costs in connection with the collection of unpaid amounts.

TXSO has failed and refused to pay its proportionate share of the operating expenses on both the WD 34 Property and the HI 552 Property since January 1, 2004. *See Innes Affidavit.* (These Affidavits are appended to FOC, MERI, and MEI's Rule 56 Motion for Summary Judgment. See reference in Section II.4 herein.)

22.　Paragraph 4 of Exhibit "A" to the Operating Agreements evidences the fact that such expenses <u>must</u> be paid, even if the working interest owner thinks they may be in error. *See Hess Affidavit*. This paragraph provides, in pertinent part, that:

> Payment of any such bills shall not prejudice the right of any Non-Operator to protest or question the correctness thereof; provided, however, all bills and statements rendered to Non-Operators by Operator during any calendar year shall be conclusively be presumed to be true and correct after twenty-four (24) months following the end of any such calendar year….

23.　These provisions clearly evidence that a non-operator must pay bills and expenses as they become due. TXSO has failed and refused to make any payments on the WD 34 Property or the HI 552 Property from January 1, 2004 to the present.[3] *See Innes Affidavit.*

24.　Noble and Coldren have proven the existence of the Operating Agreements, the fact that FOC and MERI performed under the contract, and that TXSO failed to pay its share of operating expenses. The Innes Affidavit attests to the amounts due and owing as a result of the breach. Thus, Noble and Coldren are entitled to a summary judgment that TXSO breached the Operating Agreements by failing to pay the operating expenses when due, that TXSO owes operating expenses on the HI 552 Property from January 1, 2004 to the present, that TXSO owes operating expenses on the WD 34 Property from January 1, 2004 to April 1, 2004 for all wells on that Property and operating expenses on all wells except the No. 8 Well and the No. 12 Well from April 1, 2004 to the present, and that TXSO breached he gas balancing agreement between the parties.

---

[3] As set forth, *supra*, Noble and Coldren have proven that TXSO breached the Operating Agreements under Louisiana law. See *Bond v Allemand,*, 632 So.2d at 326, 328 (La.Ct.App.1993), <u>writ denied,</u> 637 So.2d 468 (La.1994). TXSO also breached the agreements under Texas law. The elements of a breach of contract claim in Texas are (1) a valid contract, (2) the plaintiff performed or tendered performance; (3) the defendant breached the contract, and (4) the plaintiff was damaged as a result of the breach. *Keszler v. Mem'l Med. Ctr. of E. Tex.,* 105 S.W.3d 122, 128 (Tex. App. Corpus Christi 2003, no pet.)

**D.     Claim for Breach of Contract on the Gas Balancing Agreement**

25.     FOC, MERI, Noble, Coldren, and TXSO are or were parties to a Gas Balancing Agreement ("GBA").  The GBA attached as Exhibit "C" to the HI 552 Operating Agreement, and contains provisions regarding obtaining volumetric gas balance upon a permanent cessation of production.  *See GBA, Para. 3, attached to Exhibit 2 of Hess Affidavit*.

26.     The HI 552 Property ceased production on or about June 2, 2005.  In accordance with Paragraph 3.3 of the GBA, the Over producer (the party who has received more gas then to which they are entitled) must pay the Under producer (the party who has not received as much gas as they are entitled to receive) for the value of the gas to which they were overproduced. *See GBA, Para. 3, attached to Exhibit 2 of Hess Affidavit.*  Paragraph 3.1 of the GBA provides, in pertinent part, that:

> If all parties have not achieved volumetric gas balance in all categories upon termination of the Operating Agreement or upon a permanent cessation of all gas production from any lease thereunder, Operator shall furnish within thirty (30) days to all parties a statement showing the final Cumulative Overproduction (the amount by which the cumulative volume of gas taken by a party within a particular category of gas is less than the cumulative volume that party was entitled to take within such category according to its working interest) and Cumulative Underproduction (the amount by which the cumulative volume of gas taken by a party within a category of gas exceeds the cumulative volume that party was entitled to take within such category according to its working interest)of each party by category, and the month and year in which it accrued….

27.     The monthly statements showing the Cumulative Overproduction and Underproduction established that TXSO was overproduced and Noble and Coldren were underproduced.   *See Smith Affidavit and Nedelka Affidavit.*  TXSO has refused to make such payment.

28. Because TXSO was the Overproducer and received 67,139 mcf (*See Nedelka Affidavit)*, at the price of $4.388/mcf, TXSO must pay Noble and Coldren, the Underproducer. *See Smith Affidavit*. TXSO has refused to make payment and is in breach of Paragraph 3.3 of the GBA. Accordingly, Noble and Coldren are entitled to a summary judgment on its breach of contract claim and are entitled to damages in the amount of the Overproduction, or $294,605.93.

E. **Claim for Unjust Enrichment**

29. FOC inadvertently sent TXSO $73,436.00 in revenue on the No. 8 Well and $102.00 in revenue on the No. 12 Well as though it had an interest in such wells. *See Innes Affidavit*. Since TXSO admitted that it did not consent to the April AFE, it does not have an interest in these wells. *See Exhibit 14 to Hess Affidavit.* TXSO has retained this money even though it has no right to do so. Accordingly, TXSO has been unjustly enriched[4] in the total sum of $73,538.00 for which Noble and Coldren now seek recovery of their proportionate share of such revenue.

## VIII. Attorney's Fees

30. Noble and Coldren herein seek their reasonable attorney's fees as provided under the terms of the Operating Agreements whose breach by TXSO is the basis for this motion. Noble and Coldren seek their reasonable attorney's fees and their costs and expenses in the amounts of $63,000 and $1,900 respectively, as supported by the Affidavit of Lawrence F.

---

[4] Noble and Coldren are entitled to recover for unjust enrichment under Louisiana law as 1) there has been an enrichment to TXSO; 2) Noble and Coldren have been "impoverished"; 3) "there is a connection between the enrichment and resulting impoverishment"; 4) there is no "justification" for the enrichment; and 5) there is no other remedy available to FOC and MERI. See, *Baker v Maclay Properties Co.,* 648 So. 2d 888, 897 (La. 1995) (outlining the elements of a claim for unjust enrichment). Similarly, Noble and Coldren can recover under Texas law as TXSO obtained the benefit of the money by taking undue advantage of FOC and MERI. See, *Heldenfels Bros., Inc. v. City of Corpus Christi*, 832 S.W.2d 39, 41 (Tex. 1992) (A party may recover under an unjust enrichment theory when one person has obtained a benefit from another by fraud, duress, or the taking of an undue advantage.)

Labanowski, attached hereto as Exhibit "2".

WHEREFORE, Defendant/Counter-Plaintiffs Noble Energy, Inc., and Coldren Resources, LP, request that this motion be granted in its entirety and that the Court grant such other and further relief, both at law or in equity, to which they may show themselves justly entitled to receive.

Respectfully submitted,

/s/ Lawrence F. Labanowski
Lawrence F. Labanowski
Federal ID 5146
3939 Essex Lane, Suite 600
Houston, Texas  77027
ATTORNEY IN CHARGE FOR
DEFENDANTS, NOBLE ENERGY, INC.
AND COLDREN RESOURCES, LP

OF COUNSEL:

Lawrence F. Labanowski & Associates
3939 Essex Lane, Suite 600
Houston, Texas  77027
Telephone: (713) 622-0700
Facsimile: (713) 622-4766

## **CERTIFICATE OF SERVICE**

      I hereby certify that on the 20th day of July, 2007, a true and correct copy of the foregoing document has been delivered in a manner prescribed by the Federal Rules of Civil Procedure to:

Francis I. Spagnoletti
David S. Toy
Spagnoletti & Co.
401 Louisiana, 8th Floor
Houston, Texas 77002

Bradley L. DeLuca
Johnson DeLuca Kennedy & Kurisky, P.C.
1221 Lamar, Suite 1000
Houston, Texas 77010

Paul D. Clote
Paul D. Clote & Associates
4 Houston Center
1221 Lamar, Suite 1090
Houston, Texas 77010

Robert J. Sergesketter
Apache Corporation
2000 Post Oak Blvd., Suite 100
Houston, Texas 77056

                                              /s/ Lawrence F. Labanowski
                                              Lawrence F. Labanowski