UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
GALVESTON DIVISION

| | | |
|---|---|---|
| TEXAS STANDARD OIL COMPANY, | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | CIVIL ACTION NO. G-05-490 |
| | § | |
| FOREST OIL CORPORATION, *et al*, | § | |
| | § | |
| Defendants. | § | |

## ORDER

Pending before the Court are Plaintiff Texas Standard Oil Company's ("TXSO") Motion for Partial Summary Judgment (Instrument No. 106), Defendants (and Counter-Plaintiffs) Forest Oil Corporation ("FOC"), Mariner Energy Resources, Inc., and Mariner Energy, Inc.'s (collectively, "Mariner") Motion for Summary Judgment (Instrument No. 107) and Defendants (and Counter-Plaintiffs) Coldren Resources LP ("Coldren") and Noble Energy, Inc.'s ("Noble") Motion for Summary Judgment (Instrument No. 109). Having considered the motions, submissions, and applicable law, the Court determines that TXSO's Motion (Instrument No. 106) should be **DENIED**, FOC and Mariner's Motion (Instrument No. 107) should be **GRANTED IN PART AND DENIED IN PART**, and Coldren and Noble's Motion (Instrument No. 109) should be **GRANTED IN PART AND DENIED IN PART**.

## BACKGROUND

On September 7, 2005, TXSO brought suit against FOC asserting claims for breach of contract, declaratory relief, and an accounting under two Offshore Operating Agreements between and among the Parties. On January 13, 2006, FOC filed counterclaims against TXSO asserting claims for breach of contract, unjust enrichment, and declaratory relief. On May 3, 2006, FOC joined Mariner, after Mariner purchased FOC's interest in the properties made the basis of this lawsuit. Once added to the suit, Mariner filed counterclaims against TXSO, alleging the same claims previously asserted by FOC. Mariner later added a claim for breach of a Gas Balancing Agreement. In September and October, Noble and Coldren were joined in this lawsuit.[1] Noble filed counterclaims on November 14, 2006.[2]

At the heart of this lawsuit are two nearly-identical Offshore Operating Agreements ("OOAs") covering property located offshore Louisiana and Texas. The property offshore Louisiana is known as the West Delta 34 property ("WD 34 Property"), and the property offshore Texas is known as the High Island 552 property ("HI 552 Property"). Under the OOAs, FOC, and later Mariner, was the operator. TXSO, Noble, Apache, and Pioneer are or were parties to one or both of the OOAs.

---

[1] At some point, Coldren purchased Noble's interest in the WD 34 Property. Since Noble and Coldren's interests are aligned, the Court will refer to them collectively as Noble.
[2] Pioneer Natural Resources, Inc. ("Pioneer") and Apache Corporation ("Apache") are also Defendants and Counterclaimants in this lawsuit. However, since neither Pioneer nor Apache has filed dispositive motions, the Court is not addressing their claims or the claims against them.

2

Prior to late February, 2004, the No. 8 Well on the WD 34 Property was the only producing well on the WD 34 Property. However, on or about February 28, 2004, the No. 8 Well ceased production. Under the terms of the lease in effect for the WD 34 Property, the lease would expire one hundred eighty (180) days after cessation of production. In order to prevent termination of the lease, FOC, the operator, sought to determine the cause of the cessation and to develop a plan to re-establish production.

On March 19, 2004, Scott Hess, on behalf of FOC, sent an email to TXSO, Apache, Pioneer, and Noble. The email attached an Authorization for Expenditure ("AFE") which detailed the work thought necessary to restore production to the No. 8 Well ("March AFE"). Pursuant to the OOA, all interest holders had thirty days in which to decide whether or not they wanted to participate. On April 12, 2004, FOC notified the interest owners that the recommended work had changed in scope and a revised AFE would follow. Approximately one day later, FOC sent a revised AFE that included work not originally contemplated ("April AFE"). Apache, Pioneer, and Noble executed and returned the April AFE. TXSO executed and returned the March AFE on April 16, 2007. FOC notified TXSO that it had returned the wrong AFE. TXSO did not respond and never executed the April AFE.

On or about April 23, 2004, the plan set forth in the April AFE commenced.

On October 18, 2004, FOC sent out another AFE ("October AFE") which contemplated further re-completion of Well No. 8. Apache, Pioneer, and Noble executed and returned the October AFE. TXSO responded by letter dated November 5, 2004, stating that it had never consented to the operations laid out in the April AFE, and that TXSO remained in non-consent status.

During the same time period FOC was sending out AFE's to recomplete Well No. 8, the interest owners entered into a separate farmout agreement covering the WD 34 Property with the interest-owners as farmors and Helis Oil & Gas Co., L.L.C. as the farmee ("Farmout Agreement"). Though the Farmout Agreement has an effective date of February 25, 2004, it was not fully executed until April 19, 2004. The Farmout Agreement gave Helis the right, but not the obligation, to drill a well and provided that the agreement would terminate if drilling did not commence before June 15, 2004. The No. 12 Well was drilled pursuant to the Farmout Agreement, and it began producing in August, 2004.

As more fully discussed and analyzed below, the Parties now dispute the legal effect and financial ramifications of TXSO's failure to consent to the April AFE.

## STANDARD OF REVIEW

Summary judgment is proper when "there is no genuine issue as to any material fact and . . . the moving party is entitled to judgment as a matter of law."

4

FED. R. CIV. P. 56(c). The court must view the evidence in a light most favorable to the non-movant. *Coleman v. Houston Indep. Sch. Dist.*, 113 F.3d 528, 533 (5th Cir. 1997). If the party moving for summary judgment bears the initial burden of proof, "either because he is the plaintiff or as a defendant he is asserting an affirmative defense, he must establish beyond peradventure *all* of the essential elements of the claim or defense to warrant judgment in his favor." *Fontenot v. Upjohn Co.*, 780 F.2d 1190, 1194 (5th Cir. 1986). When the movant does not bear the initial burden of proof, it bears the burden of presenting the basis for the motion and the elements of the causes of action upon which the non-movant will be unable to establish a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). In either case, the burden then shifts to the non-movant to come "forward with 'specific facts showing that there is a genuine issue for trial.'" *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986) (quoting FED. R. CIV. P. 56(e)). "A dispute about a material fact is 'genuine' if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Bodenheimer v. PPG Indus., Inc.*, 5 F.3d 955, 956 (5th Cir. 1993) (citation omitted). The non-movant's bare assertions, standing alone, are insufficient to create a material issue of fact and defeat a motion for summary judgment. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986). Conclusory allegations unsupported by specific facts will not prevent an award of

summary judgment; the plaintiff cannot rest on his allegations without any significant probative evidence tending to support the complaint. *Nat'l Ass'n of Gov't Employees v. City Pub. Serv. Bd. of San Antonio*, 40 F.3d 698, 713 (5th Cir. 1994). Thus, the non-movant's burden cannot be satisfied by conclusory allegations, unsubstantiated assertions, metaphysical doubt as to the facts, or only a scintilla of evidence. *Turner v. Baylor Richardson Med. Ctr.*, 476 F.3d 337, 343 (5th Cir. 2007) (observing that "[s]ummary judgment is appropriate if a reasonable jury could not return a verdict for the nonmoving party"). It is not the function of the court to search the record on the non-movant's behalf for evidence which may raise a fact issue. *Topalian v. Ehrman*, 954 F.2d 1125, 1137 n.30 (5th Cir. 1992).

## LAW AND ANALYSIS

*Was the work outlined in the April AFE a lease maintenance operation?*

The OOA covering the WD34 provides certain penalties for a party who does not consent to an operation. The nature of the penalty depends on the character of the operation. Paragraph 8.21 of the OOA provides that:

> A lease maintenance operation is defined for the purposes of this paragraph as one required to maintain the Property or a portion thereof, at its expiration date or otherwise. A party electing not to participate in a lease maintenance operation will assign to the participating parties in the proportions in which they participate therein, all of its right, title and interest in such lease, or the affected potion thereof, free and clear of any burdens thereon as provided in Paragraph 8.16, retaining, however, its interest in and production from previously

6

> completed wells which are producing, shut-in, or temporarily abandoned.

An operation that is not a "Lease Maintenance Operation" carries a substantially lighter penalty for a non-consenting party. Specifically, Paragraph 8.12 of the OOA provides that if an operation other than a Lease Maintenance Operation results in production,

> the participants therein shall own all operating rights therein and all such production thereby obtained until such time as they shall have received currently out of the net proceeds of the sale of the share of such production to which each non-participant would have been entitled had it been a participant (after deduction of the portion of operating expenses, royalty and other payments under Article VI hereof, and severance, production or other tax on such production which would have been paid by such non-participant had it been a participant) an amount (hereinafter referred to as such non-participant's "recoupment account") equal to:
>
> (a) 400% of the share of the total cost and expense incurred in such operation through the wellhead (including platform costs where applicable) which would have been paid by such non-participant had it been a participant; and
>
> (b) 150% of the share of the total cost and expense incurred in such operation beyond the wellhead . . . which would have been paid by such non-participant had it been a participant.

All Parties agree that TXSO was a non-participating party to the work operation described in and conducted pursuant to the April AFE. The question for the Court is whether the operation described in the April AFE was a Lease Maintenance

7

Operation. The resolution of that dispute will establish which contractual penalty is appropriate in this case.

Defendants argue that the work described in the April AFE meets the contractual definition of a Lease Maintenance Operation and that FOC employee Scott Hess designated it as such in the email attaching the March AFE and later incorporated in the April AFE. TXSO argues that the work was not a Lease Maintenance Operation because (1) the notice of the operation was defective, (2) the operation was internally documented as carrying the standard non-consent penalty contained in Paragraph 8.12 of the OOA, and (3) the execution of the Farmout Agreement was sufficient to maintain the lease, so the work proposed in the April AFE was not required to maintain the lease. The Court agrees with Defendants.

Given the terms of the lease on the WD 34 Property, which are fairly standard for an oil and gas lease, the cessation of production on the No. 8 Well required remedial action if the lease was to be maintained. The lease could be maintained either by bringing the No. 8 Well back online or by drilling a new well which could begin production before the expiration of the lease. The March AFE contemplated the former and outlined the work then thought necessary to bring the No. 8 Well back into production. It is clear that FOC considered the work in the March AFE to be a Lease Maintenance Operation. The email from Scott Hess

attaching the March AFE informed the recipients that they had "thirty (30) days in which to elect to participate in this lease saving operation." Upon further consideration, the March AFE was amended, and this became the April AFE. It is significant that the April AFE and the March AFE were both AFE No. 042358, indicating that the April AFE was meant to amend the March AFE, not completely replace it. This is buttressed by the fact that Scott Hess's April email specifically referred to the March email, essentially incorporating it, including the designation as a lease saving operation.[3] Relying on the terms of the OOA, the terms of the March and April AFEs, and the terms of the emails sent with those AFEs, the Court finds that, absent some other evidence to the contrary, the work described in the April AFE was a lease maintenance operation, and TXSO's refusal to consent to the work carries penalty provided for in Paragraph 8.21 of the OOA.

Of course, TXSO contends that there is other evidence to the contrary, and the Court will now consider each of those contentions in turn. TXSO's first contention is that the notice of the operation was defective. The alleged defects are that the April AFE did not identify the operation as a "Lease Maintenance Operation" and that it set out multiple operations in violation of the OOA. The Court has already addressed the first of these alleged defects and reiterates that the transmittal information sent with the March and April AFEs indicates that the party

---

[3] TXSO seems to quibble with the designation of the operation as a lease saving operation instead of a Lease Maintenance Operation. This argument is unpersuasive. The substitution of saving for maintenance in FOC's email is of no moment. The language is entirely unambiguous.

9

proposing the operation considered it a lease maintenance operation.

TXSO's argument that the AFE was invalid because it proposed multiple operations is also unpersuasive. Paragraph 8.1 of the OOA provides that "[a]ny party, Operator or Non-Operator, may at any time propose the following operations on The Property[:] . . . (d) recompleting, deepening, reworking, or sidetracking a well which has ceased or failed to produce in paying quantities after a previous completion." The operation described in the April AFE contains both recompleting and reworking elements. TXSO claims that this renders the AFE invalid since the word *or* is used in Paragraph 8.1, indicating that the list should be read in the disjunctive. "Authorities agree that . . . *or* has an inclusive sense as well as an exclusive sense . . . The meaning of *or* is usually inclusive.'" Bryan A. Garner, *Dictionary of Modern Legal Usage* 624 (2d ed. 1995) (citing Scott J. Burnham, *The Contract Drafting Guidebook* 163 (1992)). *Or*, used in its inclusive sense, renders "A or B": A or B, or both. In this case, *or*, in its inclusive sense, allows a proposal to include any of the listed operations or any combination thereof. This reading is in keeping with common sense, which would anticipate that a combination of efforts might sometimes be necessary to restore production. Additionally, the contract gives no indication (other than that argued by TXSO) that an operation such as that described in the April AFE is not allowed or is somehow improper. Finally, despite several communications regarding the

10

operation, TXSO never complained that the proposal contained multiple operations, and did not raise this objection until litigation was already underway.

TXSO's next argument is that the operation was internally documented by FOC as an operation carrying only the standard non-consent penalty. FOC claims that the internal documentation was an inadvertent error. In any event, TXSO did not learn of this document until discovery was exchanged in this lawsuit, so the internal documentation could not have factored into its decision-making process at the time of its decision to withhold consent to the April AFE. This is especially true when the internal document, available to only one party, is contrary to the express communication among the parties. Moreover, the interest-owners other than FOC cannot fairly be held to have consented to the content of the operator's internal documents that conflict with the operator's express communications.

The existence of the Farmout Agreement is TXSO's final support for its position that the operation described in the April AFE was not a lease maintenance operation. Specifically, TXSO argues that "there was pending at the time of the April AFE, a proposal in the form of the Farmout Agreement, which, when performed, would save the lease. Since there were two proposals pending, either of which would maintain the lease, neither is required." This is circular reasoning and is not supported by the evidence. Specifically, the Farmout Agreement, which was not fully executed until after the distribution of the April AFE, was not

sufficient to maintain the lease. Though the drilling of a well pursuant to the Farmout Agreement was expected by all parties, it was not required. The Farmout Agreement stated that the failure to drill a test well by June 15, 2005, would terminate the agreement, but there was no guarantee that a well would be drilled. Without that assurance, the interest-owners could not rely on the farmee to conduct drilling required to save the lease, even if it was expected that the farmee would. Drilling had not commenced at the time the interest-owners executed the April AFE, and the Farmout Agreement had not even been fully executed at that time. The Court finds that the characterization of the April AFE as a lease maintenance operation is not changed by the existence of the Farmout Agreement.

Having now considered each of Plaintiff's arguments regarding the April AFE, the Court reiterates its finding that TXSO's failure to consent to the April AFE carries the penalty outlined in Paragraph 8.21 of the OOA. Accordingly, Plaintiff's Motion for Partial Summary Judgment (Doc. 106) is **DENIED**. To the extent that Defendants allege that the penalty in Paragraph 8.21 is applicable to TXSO's non-consent, Defendants' Motions for Summary Judgment are **GRANTED**. Paragraph 8.21 also requires a non-consenting party to assign its right, title, and interest in the lease to the remaining owners. Plaintiff breached the OOA by failing to assign its interest after refusing to consent to the lease maintenance operation. Defendants' Motion for Summary Judgment on that

breach of contract claim is **GRANTED**.

Having found that TXSO has forfeited its interest in the WD 34 lease, the Court further determines that TXSO is not liable for any expenses or entitled to any royalties from the No. 12 Well drilled pursuant to the Farmout Agreement.

Defendants have also asserted a claim for unjust enrichment for revenue from the Nos. 8 and 12 Wells inadvertently paid to TXSO after it forfeited its interest in these wells. TXSO admits that if the Court finds the interest forfeited, it was not entitled to those payments. *See* Instrument No. 113 at 3. Accordingly, the Court having so found, Defendants' Motions for Summary Judgment on their claim of unjust enrichment are **GRANTED**.

*Is TXSO's Claim for an Accounting Time-Barred?*

TXSO has requested an accounting for the period January 1, 2001, through the present covering both the HI 552 Property and the WD 34 Property, claiming that it was erroneously billed for operating expenses. FOC and Mariner have moved for summary judgment on that claim as it relates to the 2001 to 2004 time period on the ground that it is time-barred.

Paragraph 5 of Exhibit A to both OOAs states that:

> A Non-Operator, upon notice in writing to Operator and all other Non-Operators, shall have the right to audit Operator's accounts and records relating to the Joint Account for any calendar year within the twenty-four (24) month period following the end of such calendar year.

13

Similarly, Paragraph 4 provides that:

> [A]ll bills and statements rendered to Non-Operators by Operator during any calendar year shall conclusively be presumed to be true and correct after twenty-four (24) months following the end of any such calendar year, unless within the said twenty-four (24) month period a Non-Operator takes written exception thereto and makes claim on Operator for adjustment.

FOC claims that TXSO has never provided the notice required by Paragraph 5, so any claim for an accounting covering the period ending December 31, 2004 is barred, since Paragraph 5 requires that such request be made in writing before December 31, 2006, a date which has already passed.

However, the Court finds that Plaintiff's Original Complaint, filed on September 7, 2005, and served on FOC September 12, 2005, qualifies as a written exception as referenced in Paragraph 4 above, which does not specify a required form or content for a written exception. The Complaint is sufficient to preserve claims for an accounting for the period beginning January 1, 2003 and continuing through the present. TXSO has also provided evidence that it presented written exceptions to the accounting for the period from January 1, 2001, through December 31, 2002, on October 16, 2003. Those exceptions were provided after an audit was conducted. FOC refunded a substantial portion of the requested amount, and the current lawsuit seeks recovery for the difference between the requested amount and the amount previously refunded. TXSO's October 16, 2003,

written exceptions are sufficient to preserve its right to dispute charges levied during the period beginning January 1, 2001, and ending December 31, 2002. Accordingly, the FOC's Motion for Summary Judgment is **DENIED** as it relates to TXSO's claim for an accounting. TXSO did not move for summary judgment on this claim.

### *Is TXSO Obligated to Pay Operating Expenses Associated with the WD 34 Property?*

Defendants claim that TXSO has not paid Operating Expenses associated with the WD 34 Property from January 1, 2004, to the present. However, the Court has already determined that TXSO forfeited its interest in the WD 34 Property by withholding its consent on the April AFE. Accordingly, TXSO was not entitled to any revenues generated on the WD 34 Property after that point. Likewise, TXSO is also not obligated to pay operating expenses for the period after it forfeited its interest in the Property. However, TXSO remains obligated to pay the Operating Expenses incurred on the WD 34 Property between January 1, 2004, and April 1, 2004. While the Court finds that Plaintiff is required to pay these operating expenses, FOC and Mariner have not provided the Court with evidence that Plaintiff has not actually paid these expenses. Since FOC and Mariner have the burden of proof on this issue, summary judgment must be DENIED. The Motions are **DENIED** with respect to operating expenses associated with the WD 34 Property after April 1, 2004.

*Is TXSO Obligated to Pay Operating Expenses Associated with the HI 552 Property?*

Defendants claim that TXSO breached the OOA by failing to pay operating expenses associated with the HI 552 Property, and they seek summary judgment on that claim. TXSO does not seem to contest its obligation to pay operating expenses on the HI 552 Property, but it contests the amount of those expenses. While the Court finds that TXSO is obligated to pay expenses on the HI 552 Property because it has not forfeited its interest in that property, FOC and Mariner have not pointed the Court to any evidence indicating that TXSO has in fact not paid its share of the operating expenses. Since FOC and Mariner have the burden on proof on this claim, and they have only presented unsupported allegations, the Court cannot presently grant summary judgment on this breach of contract claim. Summary judgment on this claim is **DENIED**.

*Did TXSO Breach the Gas Balancing Agreement?*

Defendants argue that TXSO breached a Gas Balancing Agreement ("GBA") covering the HI 552 Property. The GBA contains provisions which govern the settlement of accounts among interest-owners after cessation of production on a certain property. Upon cessation of production on the HI 552 Property in June, 2005, the operator (FOC) provided a final accounting for the Property. According to Defendants, TXSO, as an overproducer, was required to reimburse the other parties, who were all underproducers. In support of this

argument Defendants offer affidavit testimony with invoices dated July 2006 attached. The invoices show the alleged imbalance and assign a cost of $4.388 per mcf. Plaintiff argues that the invoice information is inaccurate because it is not clear that it relates to the portion of the property actually covered by the GBA. Plaintiff even alleges that the GBA presented by Defendants is not the one applicable to the parties.[4] Additionally, Plaintiff argues that the cost assigned to the imbalance is incorrect. Defendants' documents do not indicate in which month the imbalance accrued. Therefore, it is impossible to determine the price received for the imbalance because the price varies from month to month. These issues are sufficient to preclude summary judgment on this claim. Accordingly, Defendants' Motions for Summary Judgment as they relate to the GBA are **DENIED**.

*Does the OOA's Exculpatory Clause Preclude TXSO's Claims?*

FOC's Motion for Summary Judgment argues that all of Plaintiff's claims are precluded by the exculpatory clause found in the OOA, which provides that:

> Operator shall not be liable for loss, damage, or destruction to any property of Non-Operators in connection with operations hereunder for the Joint Account on The Property, except those arising out of willful misconduct or gross negligence of Operator.

FOC argues that since there is no evidence of gross negligence or willful misconduct that FOC cannot be liable for any of TXSO's claims. Since the Court

---

[4] Plaintiff cites to another agreement, but the citation format is incorrect, and the Court is unable to determine which document Plaintiff is actually referencing.

has already denied Plaintiffs' Motion for Partial Summary Judgment, it is likely that FOC is no longer as concerned about the application of the exculpatory clause. Nevertheless, it is the Court's finding that the exculpatory clause is inapplicable in this case. The claims in this case are essentially accounting issues, and they do not concern "loss, damage, or destruction to any property." FOC's Motion for Summary Judgment on the ground that it can only be held liable for acts of gross negligence or willful misconduct is **DENIED**.

*Are Defendants Entitled to Costs and Attorneys' Fees?*

Defendants have also requested an award of attorneys' fees and costs that total nearly half a million dollars. An award of costs and fees might be appropriate at some point. However, since there are still claims which remain before the Court, it is more prudent to withhold a ruling on costs and attorneys' fees until this case is fully resolved. Accordingly, Defendants' Motions for Summary Judgment as they relate to costs and attorneys' fees are **DENIED**.

CONCLUSION

Based on the foregoing, the Court **ORDERS** that Plaintiff's Motion for Partial Summary Judgment (Instrument No. 106) is **DENIED.** FOC/Mariner's Motion for Summary Judgment (Instrument No. 107) is **GRANTED IN PART AND DENIED IN PART.** Noble and Coldren's Motion for Summary Judgment (Instrument No. 109) is also **GRANTED IN PART AND DENIED IN PART.**

SIGNED at Houston, Texas, on this **3** day of January, 2008.

*[signature: David Hittner]*

DAVID HITTNER
United States District Judge